## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

DELPHINE HENRY,                          :
                                          :
                        Plaintiff,        :        Case No. 2:12 cv 841
v.                                        :
                                          :        Judge Smith
ABBOTT LABORATORIES,                      :
                                          :        Magistrate Judge Kemp
                        Defendant.        :

## PLAINTIFF DELPHINE HENRY'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Delphine Henry, by and through her undersigned counsel, opposes Defendant's Motion for Summary Judgment. As more fully explained in Plaintiff's Memorandum, there are unsettled and genuine issues of material fact that may only be resolved by a jury of Plaintiff's peers. The threshold issue in this case – as in most discrimination cases – is intent. Did Defendant intentionally deny Plaintiff the opportunity for promotion because of her race? Did Defendant intentionally retaliate against Plaintiff because she filed a race discrimination charge? Because Defendant's true motivations are particularly difficult to ascertain, intent is inherently a factual issue for a jury to resolve at a trial, not for a court to resolve in the context of a summary judgment motion.

Furthermore, contrary to Defendant's assertions, none of Plaintiff's claims are barred by the doctrine of judicial estoppel or by the applicable statutes of limitations. Although Plaintiff will surely refer to historical discriminatory events as evidence of her claims against Defendant, her claim for monetary damages is based upon discriminatory acts that occurred after her bankruptcy and well within the limitations period. Plaintiff does not dispute Defendant's calculation of the applicable statutes of limitations. She agrees that her Title VII race claims are limited to acts that occurred on or after July 8, 2009 and her State law race claims are limited to acts that occurred on or after September 13, 2006.

Wherefore, Plaintiff respectfully requests that the Court deny Defendant's Motion and schedule this matter for a trial on the merits.

Respectfully submitted,

*/s/ Sharon Cason-Adams*
Sharon Cason-Adams (0067550)
Sharon@alhattorneys.com
Adams & Liming, LLC
1988 West Fifth Avenue, Suite 14
Columbus, Ohio 43212
(614) 488-2053 Telephone
(614) 488-2069 Facsimile

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Response in Opposition to Defendant's Motion was served upon: Jon E. Klinghoffer, Goldberg Kohn LTD 55 East Monroe, Suite 3300, Chicago, Illinois 60603 via electronic transmittal at jon.klinghoffer@goldbergkohn.com this 20th day of April 2015.

*/s/ Sharon Cason-Adams*
Sharon Cason-Adams (0067550)

Table of Contents

I.     **Summary of the Argument** ...................................................................... 1-4

II.    **Summary Judgment Standard** ................................................................ 4-6

III.   **Background Facts** ........................................................................................ 6

    A.  The Consumer Relations Department ................................................... 6

    B.  Duties of Consumer Relations Representatives ................................... 7

    C.  Performance Monitoring ..................................................................... 8

    D.  Upward Mobility in the Consumer Relations Dept. ........................... 9

    E.  Plaintiff's Complaint to Employee Relations and Her Civil Rights Charge ...................... 12

IV.   **Plaintiff's Race Discrimination Claims** ............................................... 13

    A.  Plaintiff Was Denied the Opportunity to Participate in Rep 2 Training Because of her Race ...................... 13

    B.  Plaintiff was Qualified to Participate in Rep. 2 Training ................... 14

    C.  Similarly Situated, Non-Minority, Employees Were Allowed to Participate in CR2 Training ...................... 16

    D.  Defendant's "Reason" for Not Allowing Plaintiff to Enter CR2 Training is Pretext for Race Discrimination ...................... 22

V.    **Plaintiff's Retaliation Claims** .............................................................. 25

VI.   **Plaintiff was Forced from her Career** ................................................. 31

VII.  **Plaintiff had no Motive to Conceal Her Claims from the Bankruptcy Court** ......... 32

VIII. **Conclusion** .......................................................................................... 36

Table of Authorities

*Allen v. Ohio Dep't of Job and Family Services,* 697 F. Supp. 2d 854 (S.D. Ohio 2010) ........................ 26

*Amtrak v. Morgan,* 536 U.S., 101, 113 (U.S. 2002) ......................................................... 5

*Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 250 (1986)........................................................ 5

*Bobo v. UPS,* 665 F.3d 741, 751 (6th Cir. Tenn. 2012) ............................................... 17

*Browning v. Levy,* 283 F.3d 761, 775-776 (6th Cir. Ohio 2002) ........................................33, 34, 36

*Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006............................................................................................................ 26

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) ........................................................ 5

*Clayton v. Meijer, Inc.,* 281 F.3d 605, 611 (6th Cir. 2002) ............................................. 16

*Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 n.2 (6th Cir. 2000) ......................................... 13

*Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344 (6th Cir. 1998) ............................... 16, 17

*Harms v. Cigna Ins. Cos.,* 421 F. Supp. 2d  1225 (D.S.D. 2006) ........................................ 34

*Harris v. Board of Educ,* 789 F. Supp. 1331; 1992 U.S. Dist. LEXIS 9499 ............................... 31

*Hawkins v. Anheuser-Busch, Inc.* 517 F.3d 321, 345 (6th Cir. Ohio 2008) ............................... 26

*Hill v. Forum Health,* 167 Fed. Appx. 448, 451-452 (6th Cir. Ohio 2006) ............................. 13

*Hopson v. Daimlerchrysler Corp.* 306 F.3d 427; 2002 Fed. App. 039 (6th Cir.).......................... 17

*Hunt v. Crawford,* 526 U.S. 541, 549 (1999) .............................................................. 5

*Jackson v. FedEx Corp. Servs., Inc.,* 518 F.3d 388, 394-96 (6th Cir. 2008) ............................ 17

*Laster v. City of Kalamazoo, 746 F.3d 714, 728* (6th Cir. Mich. 2014) ................................. 32

*Logan v. Denny's,* 259 F.3d at 568 (6th Cir. 2001) ...................................................... 32

*Lynch v. Freeman,* 817 F.2d. 380 (6th Cir. 1987) ........................................................ 32

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, (1986)........................... 6

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973),  . 13

*McMillan v. Castro,* 405 F.3d 405, 414 (6th Cir. 2005) ................................................ 17

*Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992) ......................................... 16

*Morris v. Oldham County Fiscal Ct.,* 201 F.3d 784, 792 (6th Cir. 2000 ................................. 26

*Muncie Power Prods., Inc. v. United Techs. Auto, Inc.,* 328 F.3d 870, 873 (6th Cir. 2003).............. 5

*Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civil Rights Commission,* 66 Ohio St. 2d 192, 196, 20 Ohio Op. 3d 200, 421 N.E.2d 128 (1981). ............................................................................. 26

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 153, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)) ...................................................................................................................................... 17

*Rifkin v. McDonnell Douglas Corp.,* 78 F.3d 1277, 1280 (8th Cir. 1996) .......................................... 6

*Saroli v. Automation and Modular Components, Inc.,* 405 F.3d 446 (6th Cir. 2005) ...................... 32

*Seay v. Tennessee Valley Auth.,* 339 F.3d 454, 479-80 (6th Cir. 2003) ........................................ 17

*Singfield v. Akron Metropolitan Housing Authority,* 389 F.3d 555, 564 (6th Cir. 2004) .............. 5,6

*Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 8 (1981). .................. 6,13

*United States ex. rel. Gerbert v. Transport Admin. Servs.* 260 F. 3d 909, 913 (8th Cir. 2001) ............ 34

*United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 716 (1983 ................... 5

*United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 716 (1983 ................... 5

*White v. Wyndham Vacation Ownership,* 617 F.3d 472, 478 ............................................................ 34

Civil Rights Act of 1964, §§ 703(a), 704(a), 42 U.S.C. §§ 2000e-2(a), 2000e-3(a) ...................... 26

Ohio Revised Code §4112 ................................................................................................................ 25

Fed. R. Civ. P. 56 (c) ........................................................................................................................ 5

# MEMORANDUM IN OPPOSITION

## I.    INTRODUCTION AND SUMMARY.

Defendant's Motion for Summary Judgment must be denied because there are genuine issues of material fact that should be resolved by a jury.  A threshold issue in this case is whether the Defendant acted with a discriminatory intent; therefore, summary judgment is not appropriate. Plaintiff Delphine Henry contends that Defendant Abbott Laboratories intentionally denied her the opportunity for promotion because she is African American.  Further, that Defendant intentionally set the bar higher for her than for her Caucasian peers.  And finally, that Defendant intentionally retaliated against her and made her work environment intolerable because she filed a civil rights charge and the Civil Rights Commission found in her favor.  Because an employer's true motivations are particularly difficult to ascertain, intent is inherently a factual issue for a jury to resolve at a trial, not for a court to resolve in the context of a summary judgment motion.  Even where all of the other basic facts are undisputed (which is not the case here) if the question of motivation itself is the sole issue in dispute, summary judgment may not be granted.[1]

Plaintiff Henry, an African American, was employed by Defendant from June 24, 1985 until September 29, 2011 when she was constructively discharged.   She spent her final eleven (11) years in the Consumer Relations Department.  For each year from 2003 through 2009, Plaintiff received Achieving Expectations (AE) on her annual performance evaluations, and thus, according to management, was "fully functioning" in her position. When compared to the performance of her Non-African American peers over the same period, Plaintiff scored as well or better on her evaluations.   For the period October 2002 through December 31, 2011 NO African American Employees were promoted to Consumer Relations Rep. 2 (CR2). Meanwhile, at least twenty-five (25) non-minority candidates were trained and promoted, maybe more.

---

[1] Section II, p. 5, Summary Judgment.  *Singlefield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 564 )(6th Cir. 2004)(citing *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 716 (1983). *Hunt v. Crawford*, 526 U.S. 541, 549 (1999).

On March 2, 2010, after receiving her seventh consecutive overall AE on her annual performance evaluation Plaintiff once again asked to be considered for promotion and was rebuffed. On May 4, 2010, after an internal complaint failed to resolve the issue, Plaintiff filed a civil rights charge alleging race discrimination.[2]

Plaintiff's race discrimination claims are not based upon Defendant's failure to *promote* her, but rather, Defendant's discriminatory decision to deny her the opportunity for promotion. Unlike her Caucasian peers, Plaintiff was not allowed to participate in the training that was a necessary pre-requisite for promotion. Plaintiff is able to satisfy *all* of the elements of her prima facie case of race discrimination. She is a member of a protected class. She applied and was qualified for a promotion. She was considered for and denied the promotion; and other employees of similar qualifications who were not members of the protected class received promotions.[3]

By virtue of her education, experience, and performance Plaintiff was qualified to participate in CR2 training in every year relevant to this case. Plaintiff has identified as many as 25 comparable Caucasian employees who worked in Consumer Relations at the same time she worked there. These individuals performed the same job she performed, reported to the same management team, were subject to the same rules and performance review process, and were required to complete the same training she was required to complete in order to be promoted. The only difference between Plaintiff and these individuals is that they were given the opportunity to be promoted to CR2 within their first two years of their tenure and she never was.[4]

When Defendant's management team was asked to explain why Caucasian Reps were identified for training and promotion but Plaintiff was not, there was no good explanation for what differentiated them.

---

[2] Section III, Background Facts, pp.
[3] Section IV (A) & (B), Race Discrimination, pp. 12-16, *Hill v. Forum Health,* 167 Fed. Appx. 448, 451-452 (6th Cir. Ohio 2006). *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 n.2 (6th Cir. 2000).
[4] Section IV(C) Race Discrimination, pp.16-22, *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344 (6th Cir. 1998); *Clayton v. Meijer, Inc.,* 281 F.3d 605, 611 (6th Cir. 2002).

What became clear from questioning Defendant's witnesses is that Plaintiff performed as well as her peers, but management just decided she "wasn't ready" for promotion. The truth is, it didn't matter how well she performed or how much she improved over the years because Plaintiff did not *look* like a CR2 candidate.[5]

Plaintiff will demonstrate that Defendant's alleged legitimate non-discriminatory reason for holding her back is pretext for discrimination by showing that Defendant held her to a different, higher standard than Caucasian candidates. Caucasian/Non-Minority candidates only had to demonstrate that they were "fully functioning" as a CR1 for one year (or less). Plaintiff met that standard for seven years in a row and still it wasn't good enough. This is one of those cases where the racism was subtle. There were no overt racial epithets, no written documents revealing the forbidden motive, but the circumstantial evidence of race discrimination is strong and a jury should be entitled to hear it.[6]

After she filed her race discrimination charge, Plaintiff was subjected to workplace harassment and discipline in retaliation for her claims. The harassment was amplified after the Civil Rights Commission ruled in her favor. Plaintiff was subjected to increased scrutiny of her performance, every detail of her work was nit-picked, the relationship with her supervisor and co-workers chilled. In February 2011, after seven consecutive years of receiving AE on her annual performance evaluations, her manager downgraded her rating to a PA (partially achieving) with NAs (not achieving) in numerous sub-categories. She was even ranked PA in her call quality scores when her monthly call quality averages actually justified an AE.[7]

On April 29, 2011, the day after the Civil Rights Commission issued its probable cause determination, Management began implementing a strategy designed to terminate Plaintiff on the basis of poor performance. Plaintiff's Managers alleged that she was not able to perform even the basic functions of her job, and that she couldn't be trusted to handle consumer calls. Based upon these allegations, upper-level

---

[5] Section IV,(C), pp. 16-22 *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998); *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

[6] Section IV(D), Race Discrimination, Pretext, pp. 22-25,*Hopson v. Daimlerchrysler Corp.* 306 F.3d 427; 2002 Fed. App. 039 (6th Cir.).

[7] Section V, Retaliation, pp. 25 - *Hawkins v. Anheuser-Busch, Inc.* 517 F.3d 321, 345 (6th Cir. Ohio 2008)

management began calling for Plaintiff's termination. In May Plaintiff was issued a disciplinary Letter of Expectation in June 2011. The Letter was based, in part, upon false call quality scores. Defendant's retaliation was such that it would dissuade a reasonable worker from making or supporting a charge of discrimination. Plaintiff waited until she was outside the workplace to file her second charge.[8]

Plaintiff read the handwriting on the wall. She was being set up for termination and she knew it. Plaintiff had suffered a reduction in her job responsibilities by being placed on the training line and not being allowed to return to her normal duties. Every aspect of her work was scrutinized and criticized. Any hope she ever had for promotion was gone. And finally, she was being subjected to discipline that she didn't deserve. Plaintiff's decision to retire was both subjectively and objectively reasonable and the facts supporting her constructive discharge claim are compelling.[9]

As to the claim that Plaintiff's claims should be dismiss pursuant to the doctrine of judicial estoppel, Plaintiff had no motive to conceal her race discrimination claims from the bankruptcy court. Therefore, to the extent that she failed to disclose these claims, such failure was inadvertent and may be excused. Furthermore, each discrete act of discrimination and each retaliatory adverse employment decision committed by Defendant constitutes a separate actionable unlawful employment practice. Plaintiff was denied the opportunity to participate in CR2 training two times per year, every year. Each denial was a separate, actionable event so that even if the pre-bankruptcy discriminatory acts are barred, those that occurred after are not.[10]

## II.  SUMMARY JUDGMENT STANDARD.

**The District Court May Not Grant Summary Judgment In A Discrimination Case Where Factual Issues Regarding Intent And State Of Mind Exist – Those Issues Must Be Submitted To A Jury For Resolution.**

---

[8] Section V, Retaliation, pp. 25 – 29, *Hawkins v. Anheuser-Busch, Inc.* 517 F.3d 321, 345 (6th Cir. Ohio 2008); *Allen v. Ohio Dep't of Job and Family Services*, 697 F. Supp. 2d 854 (S.D. Ohio 2010).
[9] Section VI, Constructive Discharge, pp. 30 - 32, *Harris v. Board of Educ*, 789 F. Supp. 1331; 1992 U.S. Dist. LEXIS 9499, *Laster v. City of Kalamazoo, 746 F.3d 714, 728* (6th Cir. Mich. 2014).
[10] Section VII, Judicial Estoppel, pp. 32-36, *Browning v. Levy*, 283 F.3d 761, 775-776 (6th Cir. Ohio 2002) *Amtrak v. Morgan*, 536 U.S., 101, 113 (U.S. 2002).

The overarching issue presented by Defendant's Motion for Summary Judgment is whether Plaintiff's evidence presents genuine issues of material fact sufficient to require submission to a jury. The short answer to that question is yes. Because a threshold issue in this case – as in most disparate treatment discrimination cases – is intent, summary judgment is not appropriate. Did Defendant intentionally deny Plaintiff Delphine Henry the opportunity for promotion because she is black? Did Defendant intentionally set the bar higher for her than for her Caucasian peers? Did Management intentionally retaliate against Plaintiff and make her work environment intolerable because she filed a civil rights charge? Because an employer's true motivations are particularly difficult to ascertain, intent is inherently a factual issue for a jury to resolve at a trial, not for a court to resolve in the context of a summary judgment motion. See, *e.g.*, *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 564 )(6th Cir. 2004)(citing *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 716 (1983). Even where all of the other basic facts are undisputed, if the question of motivation itself is the sole issue in dispute, summary judgment may not be granted. *Hunt v. Crawford*, 526 U.S. 541, 549 (1999)

To be entitled to summary judgment, Defendant must prove there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). The Court may therefore only grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. See, *Muncie Power Prods., Inc. v. United Techs. Auto, Inc.*, 328 F.3d 870, 873 (6th Cir. 2003)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 250 (1986). A court considering a motion for summary judgment must

5

view all the facts in the light most favorable to the nonmoving party, and give it the benefit of all reasonable inferences that can be drawn from the facts. *Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1280 (8th Cir. 1996); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986).

In *Singfield supra*, the Sixth Circuit Court of Appeals held that "caution should be exercised in granting summary judgment once a plaintiff has established a prima facie inference of retaliation through direct or circumstantial evidence" and agreed with other courts that "once a prima facie case is established either by the introduction of direct evidence or reliance on the *McDonnell Douglas* presumption, summary judgment for the defendant will ordinarily not be appropriate **on any ground relating to the merits** because the crux of a Title VII dispute is the 'elusive factual question of intentional discrimination,'" *Singfield*, 389 F.3d at 564 (emphasis added) (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 8 (1981).

## III.    BACKGROUND FACTS.

### A. The Consumer Relations Department.

Plaintiff Delphine Henry, an African American, was employed by Defendant Abbott Laboratories from June 24, 1985 until September 29, 2011 when she was constructively discharged. (Complaint ¶7; Answer ¶7).  In 1999 Plaintiff applied for and was awarded an entry-level position in Defendant's Consumer Relations Department.  (Henry Depo. p. 41).  The purpose of the Consumer Relations department is to educate and assist consumers, customers and healthcare professionals with questions that they have about Defendant's products and regarding the use of those products and also to register any product complaints that come in from consumers, customers, and healthcare professionals.  (Marvin Dep. p. 15, Matovich Dep. at p. 13).

As a Consumer Relations Representative 1 ("CR 1"), Plaintiff reported to Manager Carol Marvin (hereinafter "Marvin"). (Marvin Dep. at p. 15).  Marvin was one of three Consumer Relations Managers who reported to the Director of Consumer Relations, Laurie Boogard (hereinafter "Boogard").  (Boogard

Dep. at p. 13, Exhibit 67). Julie Matovich and Diane Williams were the other two Managers. (Matovich Dep. at pp. 18-19). Each Manager led a team of employees made up of full-time employees and contractors who occupied the following roles:

- Consumer Relations Representative 1 (the entry level position);
- Consumer Relations Representative 2;
- Quality Coordinators; and
- Senior Representatives.

(Marvin Dep. at pp. 18-19).[11] Each team performed the same job, followed the same policies and procedures, adhered to the same rules regarding call quality, written correspondence, and turnaround times. Each team was subject to the same performance standards. (Matovich Dep. at p. 25, Marvin Dep. at pp. 20, 31). In addition, each team manager was judged by the same performance criteria, as determined by Boogard. (Marvin Dep. at p. 28). The Managers interacted with one another daily and provided coverage for each other during vacation and other "out of office" times. (Matovich Dep. at p. 28). Team members sometimes moved from one team to another. Team members from different teams worked on projects together. (Matovich Dep. at p. 28).

Boogard was a hands-on manager who defined policies and procedures for the department and ensured that her subordinates followed those policies and procedures. She set staffing levels for the department and gave permission for hiring and promotion decisions. (Matovich Dep. at pp. 19-21). Boogard was aware of the individual performance of team members and provided input on performance evaluations and in resolving personnel issues. (Marvin Dep. at pp. 36-38). Boogard signed off on all team member performance evaluations. (Boogard Dep. at pp. 20-21).

### B. Duties of Consumer Relations Representatives.

The duties of a CR1 included, but were not limited to:

---

[11] Contract employees were not employed by Defendant, but after working as a contract employee, were often hired into a full-time role. (Marvin p. 21).

- Answering consumer, customer, field sales force and healthcare professional inquiries about pediatric and adult nutritional products via telephone, letters, emails and chats;
- Identifying and documenting all level 1 complaints completely and accurately in Defendant's system. Send required documentation to QA and compensate consumers appropriately;
- Identify level 2 and 3 complaints and forwarding to coordinators as necessary…

(Matovich Dep. at p. 29, Exhibit 1)

Level 1 complaints were simple complaints, such as complaints about taste and about dented packaging. Level 2 and 3 complaints were those that included product defects, physical stability, spoilage and adverse events. CR1's were not permitted to take Level 2 and 3 complaints. They were required to identify them and pass those complaints up to employees who had the training to handle those calls like CR2s and Coordinators. (Matovich Dep. at pp. 32-33).

## C.    Performance Monitoring.

The performance of each Consumer Relations Representative was monitored and individual feedback was shared with each CR1 using monthly reports generated by management. (Boogard Dep, at p. 34, Matovich Dep, at p. 52). Each month, managers and/or senior representatives randomly monitored three to-five recorded or live calls. Each call was scored using defined criteria and the Rep received a rating that ranked their performance as follows:

- EE: Exceeding Expectation (100%);
- AE: Achieving Expectation (94-95%);
- PA: Partially Achieving Expectations (89-93.9%); and
- NA: Not Achieving Expectations (88.9% or less).

Complaint documentation and written correspondence produced by the Rep. were also monitored and scored on a monthly basis. (Marvin Dep. at pp 112-114, Exhibit 40). Boogard received monthly reports from each of her managers that included the individual monthly scores for each employee. (Boogard Dep. at p. 40, Exhibit 64).

Formal performance assessments were conducted annually. Evaluations included a compilation of the monthly scores along with a number of other performance criteria. The performance evaluation

document was divided into three sections: 1) Core Job Responsibilities, 2) Goals, and 3) Competencies. Each section was comprised of multiple sub-categories which were individually rated, then a score was assigned for each section, and finally, an overall performance evaluation score was assigned. The scores assigned for the Core Job Responsibilities and Competencies sections were largely based upon the subjective opinion of the managers. The scores assessed for the Goals section were more objective because those scores were based upon measurable data. (Boogard Dep. at pp. 30-33).

Boogard signed off on each evaluation before it was presented to the employee and sometimes suggested changes to the ratings. (Boogard Dep. at pp. 27-28). As above, Representatives were ranked using one of four ratings: Not Achieving Expectations (NA) on the low end Exceeding Expectations (EE) on the high end. Employees rarely received EE as an overall rating. According to Matovich and Marvin the annual performance assessment was a good gauge of whether a Consumer Relations Representative 1 was "fully functioning" in their position. (Marvin Dep. at p. 115, Matovich Dep. at pp. 54, 98-99).

For each year from 2003 through 2009, Plaintiff received Achieving Expectations (AE) on each of her annual performance evaluations, and thus was "fully functioning" in her position. (See, Marvin Dep. Ex.s 29, 31, 32, 34, 37). When compared to the performance of her Non-African American peers over the same period, Plaintiff scored as well or better on her annual performance evaluations. (See Below).

**D.  Upward Mobility within the Consumer Relations Department.**

If a CR1 wanted to be promoted and remain in the Consumer Relations Department, the only available position was CR2. (Matovich Dep. at p. 38). According to the CR2 job description, the minimum qualifications to become a CR 2 were as follows:

> Undergraduate Degree in dietetics, business, communications or biology preferred. Nutritional knowledge is a plus. Background: **One year experience as a "fully-functioning Abbott Nutrition Consumer Rep 1** who successfully completed all Pre-Assessment procedures (including surveys and testing) and Rep. 2 training.

(Matovich Dep. at p. 37, Exhibit 2, emphasis added).

Generally speaking, as long as a CR1 was performing well in their position and meeting their goals and core job responsibilities, they would move into a CR2 position within a year or two of their hire date. (Matovich Dep. at pp. 38-39). Each year, when Plaintiff met with her Manager to discuss her performance evaluation and her growth plans, she expressed a desire to be promoted to CR2. (Marvin Dep. at p. 221).

The formal process for becoming a CR2 is detailed in an Action Plan that was developed by department managers. (Matovich Dep. at pp. 105-106, Exhibit 9). Boogard reviewed the process and expected her managers to adhere to it. (Boogard Dep. at pp. 43-44). The Plan outlines a number of steps that an employee must complete before being promoted. Phase I of the plan has two states as follows:

1. <u>Identification of potential candidates:</u>
   a. Team Managers to identify and provide a list of candidates to Senior Coordinators by the first business day of August and February of each year.

2. <u>Rep II Readiness Survey;</u>
   a. Senior Representatives complete survey within 5 business days of receipt and return to Senior Coordinators;
   b. Coordinators complete survey within 5 business days of receipt and return to Senior Coordinators;
   c. Senior Coordinators will compile survey results and provide them to Team Managers within 3 business days.
   d. Team Managers will determine if potential candidate will move to Phase 2 or provide potential candidate with an individual action plan within 7 to 10 business days.

(Matovich Dep. Ex. 9).

At each step of the Plan, Managers have control. Managers *choose* who to identify as a potential candidate. After the pre-assessment surveys are completed, Managers *choose* who advances to training. After training, Managers *choose* who to promote. (Matovich Dep. p. 103, Ex. 9).

Managers Matovich and Marvin testified that surveys were circulated for every CR2 candidate.[12] However, their testimony reveals that for some Caucasian candidates, the survey process was a mere formality and promotion to CR2 was a foregone conclusion. [See Section III (C) Below].    These pre-assessment surveys were anonymous and the "score" an employee needed in order to pass to the next phase

---

[12] In Discovery, Plaintiff requested survey results for 27 comparable employees, but not all were provided. See Motion for Sanctions for Spoliation of Evidence.

was discretionary. Matovich testified that there was no fixed score, no rule. (Matovich Dep. p. 110). Marvin testified that the score needed may have been 80% or 85%, but some survey questions were "meatier" than others. (Marvin pp. 183-188). When asked what score was needed to "pass" Boogard testified that the Managers made that decision and that surveys were only part of the decision to place an employee in training. (Boogard pp. 47-48).

From 2002 until 2011, the only CR1s on Matovich's team who did not undergo CR2 training were contract employees or employees who did not complete one year of service. In all of her years as a Manager, Matovich had only one CR1 who was not promoted to CR2, a Caucasian employee named Donna Papps. Papps had previously been promoted to CR2 before Matovich was a manager. Matovich demoted her because she was struggling in the role. (Matovich Dep. at pp. 39-41). Even though Papps did not do well in the CR2 role, she was given the opportunity to retake the training. (Papps Dep. pp. 25-27).

Marvin was a Manager in Consumer Relations from 1999 until August 2013. To the best of her recollection, from 2001-2011, Marvin could not identify any CR1 on her team, who went through CR2 training and was not promoted.[13] (Marvin Dep. at pp. 156-157).

During the course of discovery in this case, Plaintiff identified twenty-seven (27) Caucasian/Non-African American employees who were promoted from CR1 to CR2. Matovich and Marvin confirmed that all were promoted to CR2. Although at least one Caucasian employee, Natasha Kern, was not "promoted," she was hired as a CR2. (Matovich Dep. at pp. 45-49, Marvin Dep. at pp. 161-164, Ex. 3, pp. 1-4).

For the period January 1, 2002 through December 31, 2011 there were only five African American employees who occupied the position of CR 2. Only two of them ever worked for Marvin. (Marvin Dep. p. 26). From October 2002 through December 31, 2011 NO African American Employees were promoted to CR2. (Matovich Dep. Ex. 11; Int. 13, pg. 12). Meanwhile, at least 27 non-minority candidates were trained and promoted, maybe more.

---

[13] Monica Harvell, an African American, went through training, but removed herself from the promotion process.

**E. Plaintiff's Complaint to Employee Relations and Her First Civil Rights Charge.**

In the first quarter of 2010, a number of changes took place in the Consumer Relations department. A number of employees, (except Plaintiff) were being promoted. (Marvin Dep. p. 267). Some of the employees who were receiving promotions had only recently been hired and had previously been serving as temporary employees.

On March 2, 2010, after receiving her seventh consecutive overall AE on her annual performance evaluation in February 2010, Plaintiff emailed Boogard and Marvin reiterating her interest in being promoted to CR2. Marvin testified that she and Boogard had discussed Plaintiff's desire for promotion many times and that Boogard supported her decision not to identify Plaintiff as a candidate. (Marvin Dep. pp. 250-51).

Management rebuffed Plaintiff's overture. Frustrated, Plaintiff finally contacted the Corporate Employee Relations Department in Chicago to lodge a complaint. (Henry Dep. at pp. 110-113, Ex 10). Investigator Deborah Boskovic was assigned to handle the complaint. In a series of emails and telephone conversations, Plaintiff expressed her concerns and questions, but did not explicitly mention race discrimination because she valued her job and feared retaliation. (Henry Dep. at p. 257). In an email dated April 27, 2010 Plaintiff informed Boskovic of recent promotions in the department. She pointed specifically to two employees who were hired in 2009 and had already taken CR2 training. She asked whether her experience counted for anything and referenced the fact that she had the requisite qualifications for the CR2 position. (Henry Dep. Ex. 10). In another email, dated May 2, 2010 she provided Boskovic with a long list of people who had recently taken CR2 training. Her list included hire dates and dates of training to illustrate that some employees had taken the training within less than two years of their hire date. (Henry Dep. Ex. 35).

On May 4, 2010, when it became apparent to Plaintiff that her internal complaint would be fruitless, she filed her first civil rights charge with the Ohio Civil Rights Commission. (Henry Dep. at pp. 113-114,

Ex 11).  She alleged race discrimination, failure to promote.  Defendant was notified of her charge soon thereafter.  Deb Boskovic noted the charge in her log on June 10, 2010.  (Boskovic Dep. p. 84, Ex. 4).

## IV.   PLAINTIFF'S RACE DISCRIMINATION CLAIMS.

### A.   Plaintiff Was Denied The Opportunity to Participate in Rep. 2 Training Because of her Race.[14]

In *Hill v. Forum Health,* 167 Fed. Appx. 448, 451-452 (6th Cir. Ohio 2006) the Court reaffirmed that the evidentiary requirements for establishing a prima facie claim of race discrimination (failure to promote) under Title VII and Ohio law are evaluated under the same standards. *See Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 n.2 (6th Cir. 2000). Where, (as here) a plaintiff relies on circumstantial evidence of discrimination, her evidence is evaluated under the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253-06, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981), summarized as follows:

To establish a prima facie claim of racial discrimination based on a failure to promote under Title VII of the Civil Rights Act of 1964, a plaintiff generally must demonstrate that: (1) (s)he is a member of a protected class; (2) (s)he applied and was qualified for a promotion; (3) (s)he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions. After a plaintiff creates a presumption of discrimination by establishing a prima facie case, a defendant may rebut the presumption by proffering a legitimate, nondiscriminatory reason for its decision. The plaintiff then bears the burden of showing that the defendant's proffered reason is pretextual.

---

[14] Plaintiff's Motion for Sanctions for Spoliation of Evidence is still pending at this time.  As pointed out in that Motion, Plaintiff has been denied the opportunity to examine material evidence relevant to her race discrimination claims and is thus, at a severe disadvantage in responding to Defendant's attack on her case.  Defendant argues that Plaintiff was not qualified for promotion and that she cannot prove pretext.  Defendant argues that Plaintiff's survey scores were the "reason" she was not promoted.  Because of Defendant's spoliation of evidence, namely the survey results and performance evaluations of comparable employees, Defendant's Motion for Summary Judgment should be denied.

A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. If a plaintiff can show that the defendant's proffered, nondiscriminatory reason is pretextual, the trier of fact may infer discrimination. Nevertheless, the ultimate burden of proof to show discrimination remains on the plaintiff at all times. *Dews*, 231 F.3d at 1020-21 (footnote, citations omitted).

Defendant argues that Plaintiff Henry is unable to satisfy the second and fourth elements of her prima facie case and that she is unable to establish pretext. Given the opportunity, a reasonable jury evaluating the facts in this case would certainly reach a different conclusion.

**B.      Plaintiff was Qualified to Participate in Rep. 2 Training.**

Although Plaintiff's goal was to become a Consumer Relations Rep. 2, her race discrimination claims are not based upon Defendant's failure to *promote* her to that position, but rather, Defendant's discriminatory decision to deny her the opportunity to participate in the Rep. 2 training that was a necessary pre-requisite for promotion. Stated succinctly, Plaintiff's complaint is that she was never given the opportunity to even try for a promotion.

According to Defendant's CR2 job description, the minimum qualifications to become a CR2 were as follows: 1) Undergraduate Degree in dietetics, business, communications or biology preferred. Nutritional knowledge is a plus;  2)  One year experience as a "fully-functioning" Abbott Nutrition Consumer Rep 1; and, 3) Successful completion of all Pre-Assessment procedures (including surveys and testing) and Rep. 2 training.

The educational requirements for CR1 and CR2 were the same.  Thus, Plaintiff had the requisite degree for promotion.  According to Defendant's management team, if an employee received an overall achieve expectations (AE) on their annual performance evaluation, they were considered a "fully functioning" CR1 and were therefore eligible to be promoted, even if they had some discipline in their file. (Matovich Dep. 104).  Plaintiff achieved an AE in each year from 2003 to 2009.  The only remaining hurdle

for Plaintiff was the pre-assessment process. Pursuant to Defendant's CR2 Action Plan, it was the Manager's job to identify her as a candidate for that process.

According to Plaintiff's Manager, Carol Marvin, each time surveys were circulated regarding Plaintiff's readiness for promotion the results were "unfavorable" and Marvin decided not to permit Plaintiff to move to Phase 2 of the process. (Marvin Dep. at pp. 177, 209-210, 253, Ex.27). Marvin admits that even though Plaintiff continuously expressed a desire to be promoted and consistently received AEs on her annual performance evaluations, Marvin did not identify Plaintiff as a candidate in 2007, 2008, 2009, or even 2010. In each of those years, Marvin arbitrarily decided that Plaintiff just wasn't ready. (Marvin Dep. pp. 219-243). Thus, no surveys regarding Plaintiff were circulated in those years even while newly hired Caucasian employees were identified, trained and promoted to CR2s.[15]

Defendant incorrectly states that Ms. Henry "admits that she was not qualified for promotion in 2010." Plaintiff made no such admission; rather, she admitted that she received a PA on her annual performance evaluation for Year 2010. However, Defendant fails to mention that this evaluation was given to Plaintiff in February 2011 in **retaliation for the Civil Rights charge she filed in May 2010.**

The real and material question of fact left to be decided by a jury is whether the third "qualification" for becoming a CR2 was applied to Plaintiff differently because of her race. For the specific years at issue in this case, 2006 through 2010, Marvin only allowed Plaintiff to go through the pre-assessment survey process twice: once in 2006 and once in 2010 (after she complained to Employee Relations). According to Defendant's management team and the written procedure they created, the pre-assessment process occurred twice per year. As such, Plaintiff should have been identified as a candidate ten times in those five years, but she wasn't. Did Carol Marvin intentionally exclude Plaintiff from this process because of her race?

When questioned about why Plaintiff wasn't identified, Marvin made excuses. She admitted that Plaintiff had good scores and received high praise from her peers, but then argued that Plaintiff's growth

---

[15] Pre-assessment surveys were circulated for Plaintiff in or around March 2010 after she complained to Employee Relations, but the process was never completed.

wasn't sustained. For example, after admitting that Plaintiff improved her probing and decision-making skills in 2007, Marvin testified "She improved. She did improve, but it didn't stay consistent. There were ups and downs." (Marvin Dep. p. 219). The problem with Marvin's excuses is that most of Plaintiff's Caucasian peers were promoted (or identified as a candidate for promotion) within **one year** of their hire date. (See facts below). Thus, these non-minority individuals were only required to demonstrate "consistency" for one year – pursuant to Defendant's Action Plan. Plaintiff demonstrated that she was "fully functioning" for seven years in a row, but it wasn't enough for Marvin.

As for the two times that Plaintiff was identified as a candidate, according to Defendant, Plaintiff did not "pass" the pre-assessment survey process. Unfortunately, none of Defendant's witnesses could really explain what "passing" meant. Boogard, who was in charge of overseeing the process, couldn't explain how the surveys were scored, but testified that surveys were only part of the decision-making process. (Boogard Dep. pp. 47-48). Furthermore, Plaintiff's manager admitted that not all of the surveys were always returned after they were disseminated. (Marvin Dep. p. 202). Ultimately, regardless of what the surveys said about the candidate, it was really the Manager's decision whether the candidate moved on to the training process. Neither Marvin nor Boogard EVER allowed Plaintiff the opportunity to enter training.

## C. Similarly Situated, Non-Minority, Employees Were Allowed to Participate in CR2 Training.

Similarly situated employees are ones who have "dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). In determining whether an allegedly comparable employee is similarly situated, the ultimate question is whether "all of the *relevant* aspects of [his] employment situation were 'nearly identical' to those of the [comparator's] employment situation." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998); *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002). However,

the burden of pointing to a "similarly situated" employee is not onerous and a plaintiff need not demonstrate similarity in all respects. *Jackson v. FedEx Corp. Servs., Inc.*, 518 F.3d 388, 394-96 (6th Cir. 2008).

In *Bobo v. UPS, 665 F.3d 741, 751* (6th Cir. Tenn. 2012) the court further clarified the plaintiff's burden in identifying comparable employees and stated that, the "same supervisor" criteria stated in *Mitchell*, "does not automatically apply in every employment discrimination case." citing, *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005). Moreover, we have never read "the 'same supervisor' criterium" as an "inflexible requirement." *Seay v. Tennessee Valley Auth.*, 339 F.3d 454, 479-80 (6th Cir. 2003). Whether it is relevant in a particular case that employees dealt with the same supervisor depends on the facts presented. *McMillan*, 405 F.3d at 414. Thus, the focus of the litigation is not on a comparison of "the employment status of the plaintiff and other employees in every single aspect of their employment." *Ercegovich*, 154 F.3d at 352. As the Supreme Court explains, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

Contrary to Defendant's erroneous argument, Plaintiff has identified the following comparable Caucasian employees who worked in Consumer Relations at the same time she worked there, who performed the same job she performed (CR1), who reported to Boogard, and one or more of her Team Managers, who were subject to the same rules and performance review process, and who were required to complete the same training she was required to complete in order to be promoted.[16] The only real difference between Plaintiff and these individuals is that they were allowed to enter training and were promoted to CR2 within their first two years of service and she was not:

Andrea Shingledecker; Autum Oker; Cory Warner; Kelly Snyder; Deanna Myers; Tom Steinbrink; Rachel Wallis; Molly Spitler; Amanda Nelson; Sara Harchar (Asian); Natalie Spencer; Sara Collura (Lewis);

---

[16] Plaintiff provided the Employee Relations Dept. with a list of employees that included most of these names. (Plaintiff's Dep. p. 282, Ex. 35). Plaintiff also provided a list of comparable employees in response Defendant's written discovery requests (Answer to Interrogatory No. 10).

Kristy Nolan; Lauren Wilson (Moore); Pam Scott (DeMauge); Kristin Beery (Fetter); Christy Estes; Tiffany Graham; Jamie Davis; Danielle Fabing (Robertson); Dawn Green; Natasha Kern Joe Green; and Paul Manson.

When compared to the performance of her Non-African American peers over the same period, Plaintiff scored as well or better on her annual performance evaluations.  For example:

For Performance Year 2004 – Tiffany Walker Graham (Caucasian) received an overall rating of Achieving Expectation, so did Plaintiff.  (Matovich Dep. Ex. 4; Marvin Dep. Ex. 29).  Plaintiff and Graham both received AEs in each of the three performance subsections.  This was Ms. Graham's very first year of employment.  (Matovich Dep. p. 51).  Plaintiff had been in the department for over four years.  In her first year as a CR1, Graham articulated that she wanted to be promoted to a CR2.  As of the date of her performance evaluation (March 2, 2005) Graham had not completed the pre-assessment process, but Ms. Matovich already knew that Graham would be going through CR2 training.  (Matovich Dep. p.75).  Graham was subsequently promoted several times.  (Matovich p. 76)

For the performance year 2006, Sara Lewis Collura (Caucasian) was a first year CR1.  (Matovich p. 85, Ex. 6).  Plaintiff had been in the department for six years.  (Marvin Dep. 209, Ex. 31).  Both Collura and Plaintiff received AEs in each performance subsection. They each received AE on their overall performance rating.  With regard to their objectively measured goals, the following is an illustration of how the two employees compared:

| Goal | Collura | Collura's Rating | Plaintiff | Plaintiff's Rating |
|---|---|---|---|---|
| Call Quality: | 97.48% call quality average | AE | 97.45% call quality average | AE |
| Written Correspondence: | 35 letters 97.14% accuracy | AE | 136 letters, 96% accuracy | AE accuracy EE turnaround |
| RPIC Accuracy Rate: | 181complaints documented with 99.45% accuracy | AE | 310 complaints documented with 99.8% accuracy | EE |
| CADb Logging: | Logged with 99.89% | AE | Logged 111.9% of her calls with | AE |

| | product detail | | 99.96% detail | |
|---|---|---|---|---|
| Phone Efficiency: | Phone efficiency rate: 99% for 2 quarters | EE | Phone efficiency rate: 101% for 1 quarter | EE |
| Financial: | Appropriate decision-making | AE | Used sound judgment | AE |
| People: | Participated in department events | AE | Participated in all team and department events | AE |
| Personal Goal: | Participated in 2 sit withs to prepare for upcoming Rep. 2 training | AE | Worked on creating an improved process... | AE |

Just like Tiffany Walker Graham, Sara Lewis Collura was identified for Rep. 2 assessment and training within her first year of employment. (Matovich Dep. p. 89). The same was true for Kristy Nolan (Caucasian) who was hired May 15, 2006. Ms. Nolan scored an AE on her annual performance evaluation dated June 27, 2007. Like Ms. Collura, her performance evaluation states that she "will have an opportunity to complete Representative II training." (Matovich Dep. p. 93, Ex. 7). Sara Herchenhahn (Asian) was also scheduled to participate in CR2 training within her first year on the job. After awarding her an overall AE on her evaluation, Ms. Marvin wrote the following comments: "Sara will be starting Rep II training in August." (Marvin Dep. pp. 143-144, Ex. 23). Plaintiff was not identified as a candidate for CR2 training in 2007 and, therefore, not given the opportunity to participate in training. (Marvin Dep. p. 219).

On March 5, 2009 Plaintiff received her evaluation for 2008. She received an overall AE, with AE's in each subsection. (Marvin Dep. p. 248, Ex. 37). Amanda Nelson received her very first performance evaluation on February 19, 2009. She was hired May 5, 2008. (Marvin Dep. p. 146, Ex. 24). Nelson received an overall AE with AEs in each subsection. During the course of her review, Ms. Nelson stated that qualifying for CR2 training was a personal goal and Ms. Marvin made note of the skills she would want to develop in order to prepare for a possible CR2 promotion. Ms. Neslon was promoted. (Marvin Dep. p.

151).  There were no such notations in Plaintiff's evaluation and Plaintiff was not identified for training nor was she promoted. (Marvin Dep. Ex. 37).

On February 2, 2010 Plaintiff received her performance evaluation for performance year 2009. (Marvin Dep. p. 241, Ex. 34).  Rachel Wallis (Caucasian) (hired in July 2009) received her evaluation on February 4, 2010.  (Matovich Dep. p. 95, Ex. 8).  Both Ms. Wallis and Plaintiff received an overall AE with AEs in each subsection.  Their objective scores compare as follows:

| Goal | Wallis | Wallis' Rating | Plaintiff | Plaintiff's Rating |
|---|---|---|---|---|
| Call Quality: | Took 3,834 calls with 98.6% call quality average | AE | Took 9,319 calls with 97% call quality average | AE |
| Written Correspondence: | No quality or accuracy score noted | AE | 120 letters completed, accuracy rate of 97.5% | AE |
| RPIC Accuracy Rate: | 98 complaints documented with 98.98% accuracy | AE | 244 complaints documented with 99.2% accuracy | AE |
| CADb Logging: | Logged 100% of her calls with product detail | EE | Took 9,319 calls and logged 100% with product detail | EE |
| Phone Efficiency: | Phone efficiency rate: 94.13% | AE | Phone efficiency rate: 97.8% | EE |
| Financial: | Appropriate decision-making | AE | Used sound judgment | AE |
| Personal Goal: | Completed two training courses | AE | Attended a One Day Workshop | AE |
| Overall: | | AE | | AE |

In her commentary on the last page of Ms. Wallis' performance evaluation, Ms. Matovich states: "Rachel will go through Rep 2 training in January, 2010." (Matovich Dep. p. 98). Wallis had not completed one year of service at this point.  Plaintiff was not identified as a candidate in her performance evaluation and was not scheduled for Rep. 2 training in January 2010. (Marvin Ex. 34).

When asked to compare Plaintiff to comparable employees who received the same scores on their performance evaluation, Marvin **did not** point to pre-assessment survey scores as the reason why these employees were superior candidates for promotion than Plaintiff.  Instead, she provided a list of subjective reasons:  For example, Sara Harchar's "confidence level continued to grow and she was able to use thought processes that are needed…"  Whereas, she explained, "with Delphine's it would come and go, but there wasn't a steady growth…" (Marvin Dep. p. 226).  Amanda Nelson was promoted in 2008 even after Marvin identified issues with her decision making ability.  When asked to explain why Nelson was a better candidate, Marvin explained, "because she in everything that she did with the calls, the writing and everything it was clear communications, providing the consumer with correct information and clearly communicating whether it be a product complaint or just anything, clear communication, not confusing information."  Marvin admitted that Nelson received the same overall score on her performance assessment as Plaintiff did for that year.

One of the Core Job Responsibilities listed on the CR1 performance evaluations that year was as follows:

> Identify all product complaints.   Probe to clarify the situation.  Handle all Level I/II complaints when appropriate.  Gather information on specific product, consumer's name and phone number and his or her concern.  Transfer consumer to Support after providing pertinent information to the Consumer Relations Quality Coordinator.

On Nelson's evaluation, Marvin wrote: "Amanda successfully identified and documented Level 1 complaints according to guidelines.  Handled 177 complaints with 100% accuracy rate for the reviewed period (which was only a partial year).  Identified complaints that should be transferred to quality coordinators, providing appropriate information for transfer, such as name, phone number, product, form, size and place of purchase." (Marvin Dep. Ex. 24).

On Plaintiff's evaluation, Marvin wrote: "Delphine probed carefully and focused intently when identifying potential RPIC's.  In 2008 she handled and documented 480 Rep 1 Level complaints with a 99.5% accuracy rate." (Marvin Dep. Ex. 37).

In Nelson's summary, Marvin wrote: Amanda should focus on strengthening her decision-making skills by sufficiently probing before placing her consumers on hold so she has all information needed to research their requests. She wants to develop her skills on handling complaints in order to prepare for a possible Rep II promotion."

Despite the fact that Plaintiff handled more complaints and and received the same overall scores as Nelson, Marvin made no mention of a possible promotion for Plaintiff.

When presented with performance evaluations for five of the comparable employees and asked why they were identified for training and promotion but Plaintiff was not, Laurie Boogard could not provide insight into what differentiated them. When asked what more evidence she would need in order to be able to answer the question, Boogard did not mention the pre-assessment survey results. Instead, she testified she would have to speak with the Managers. (Boogard Dep. pp. 88-105) "Team Managers made the decision on who moved forward in the Rep. II, so I would speak to each one of the team managers." She then admitted that she was responsible for overseeing the process. (Boogard Dep. p. 95). Thus, it is clear that the promotion decision rested entirely with Boogard and her Managers and that the survey results were only part of the decision-making process. (Boogard Dep. p. 48). The truth is, it didn't matter what the survey results said because Plaintiff did not look like a CR2 candidate.

### D. Defendant's "Reason" for Not Allowing Plaintiff to Enter CR2 Training is Pretext for Race Discrimination.

In *Hopson v. Daimlerchrysler Corp.* 306 F.3d 427; 2002 Fed. App. 039 (6th Cir.), the court reversed and remanded a summary judgment decision in a case like this one. In *Hopson* the court considered the race discrimination/failure to promote claims of an African American employee who had been with his company since 1968. He, like Plaintiff Henry, had obtained his college degree while working for the employer and had worked his way up from the assembly line to a salaried supervisory position. *Id.* At 428-429. Beginning in 1998 he applied without success for five job openings in the company. Each time he was denied, the same decision-maker rejected him. Each time, this same decision-maker gave vague and untrue

explanations for why the plaintiff was not the best candidate, but mostly relied on the justification that white candidates scored better on their annual evaluations. *Id.* 434-435.

While recognizing that traditionally, management may exercise its prerogatives in choosing among qualified candidates, the court rejected the employer's explanations for why the plaintiff wasn't even interviewed. The court stated:

> (i)n each of the foregoing instances, the alleged legitimate, non-discriminatory reason was vague, failed to specify the manner in which the white employees were better qualified, or the degrees of difference in the annual evaluations. Moreover, it is virtually unfathomable, given Hopson's education and management experience, that he was not even interviewed for any of these positions. Indeed, a reasonable juror could find that these circumstances bespeak a pattern or practice of discrimination which resulted in the Plaintiff's not being promoted. In our view, this record contains a genuine issue of material fact that makes summary judgment inappropriate."

> *Id* at 436.

In this case, after Plaintiff complained to Defendant's Employee Relations Department about not being allowed to participate in training, Manager Carol Marvin was asked to provide Employee Relations with an explanation of the skills needed to advance to the CR2 position and to explain why Plaintiff did not possess those skills. On June 10, 2010 Marvin answered those questions in an email to Deb Boskovic. (Marvin, Dep. Ex. 43). Marvin's criticisms of Plaintiff were as follows:

> Delphine's internal notes within the department consistently include misspelled words or grammatical errors. Her "Ask the Expert" written inquiries to Medical have to be re-written by her Sr. Rep. before being sent.

> Most important – Delphine needs to be able to take any call or question that she gets without depending on her Sr. Rep or her peers to provide the correct information to her. She often requires assistance in handling *Consumer Rep I* calls and shows very little understanding or confidence in handling escalated calls which Consumer Rep IIs routinely handle. (emphasis in original.)

When compared to Plaintiff's February 2010 performance evaluation results, it is clear that Marvin manufactured these excuses to cover her discriminatory decisions. In her evaluation, Plaintiff received an AE for her Written Correspondence, E-Mails and Inquiry Letters. The following details were included in

the evaluation: "Delphine completed 120 letters with an accuracy rate of 97.5%." There was no mention whatsoever of inaccurate "Ask the Expert" inquiries.

Furthermore, Plaintiff's performance evaluation contains NO commentary regarding her alleged inability to handle CR1 calls. Nor is there any mention of the allegation that Plaintiff "often" requires assistance in handling CR1 calls. She received an AE for Call quality and AEs for all of her Core Job Responsibilities. (Marvin Dep. Ex. 34). When asked to quantify the word "often" and reconcile this apparent inconsistency, Marvin was at a loss:

**Question:** If a person was a Rep1 and requires assistance often in handling consumer Rep1 calls are they "fully functioning" as a CR1?

**Answer:** At times she was fully functioning and doing fantastic. Other times she became less confident, and this is the area where we got into the less confident.

**Question:** If a consumer Rep1 often requires assistance in handling consumer Rep1 calls and shows very little understanding or confidence in handling escalated calls are they achieving expectations as a CR1?

**Answer:** They are achieving it if it's most of the time they're doing a good job and it's just a few times that this happens.

Marvin went on to explain that the word "often" means "every day" then admitted that Plaintiff wasn't doing "it" every day. (Marvin Dep. pp. 274-279). Whatever "it" was.

When Boogard was questioned about whether the criticisms detailed in Marvin's June 10 email should have appeared in Plaintiff's performance evaluation, she agreed that, if the manager was aware that a Rep.1 often required assistance in handling CR1 calls she would expect the manager to include that criticism in the performance evaluation. She testified: "because that indicates to me that they're not able to perform the basics of the Rep 1 duties." (Boogard Dep. pp. 108-110).

It is true that Marvin never used racial epithets in Plaintiff's presence, but from Plaintiff's perspective there was evidence of Marvin's racial animus. Marvin often mocked Plaintiff in front of her co-workers. If Plaintiff mispronounced a word, such as saying "ax" instead of "ask," Marvin would demean her and make a joke of it. Plaintiff describes her dialect as "Appalachian." Those were not Marvin's words.

24

But one thing is for sure, in all the years that they worked together, Plaintiff never heard Marvin mock or demean a Caucasian employee who mispronounced words. (Plaintiff's Dep. pp. 75-77; 305-306).

With regard to Defendant's argument that African American employees were promoted in the Consumer Relations Department, it is important to note that only two of those employees worked for Marvin. Furthermore, between October 2002 and December 2011 NO AFRICAN AMERICAN EMPLOYEES WERE PROMOTED TO CR2.

As in the *Hopson* case, Defendant was holding Plaintiff to a different, higher standard than Caucasian candidates. Caucasian candidates only had to demonstrate that they were "fully functioning" as a CR1 for one year (or less). Plaintiff met that standard for seven years in a row and still it wasn't good enough. Plaintiff has certainly met her burden with regard to demonstrating pretext.

As the *Hopson* Court reiterated:

> discrimination victims often come to the legal process without witnesses and with little direct evidence indicating the precise nature of the wrongs they have suffered…Cases charging discrimination are uniquely difficult to prove and often depend upon circumstantial evidence…This is true in part because…discrimination…is often subtle….An employer who knowingly discriminates may leave no written records revealing the forbidden motive and may communicate it orally to no one…The distinct method of proof in employment discrimination cases… arose out the Supreme Court's recognition that direct evidence of an employer's motivation will often be unavailable or difficult to acquire.

*Id* at 436. (Internal citations omitted).

## V. PLAINTIFF'S RETALIATION CLAIMS.[17]

### A. Defendant Subjected Plaintiff to a Hostile Work Environment in Retaliation for Her Race Discrimination Charge and the Civil Rights Commission's Probable Cause Determination.

Plaintiff was subjected to discipline and workplace harassment in retaliation for her race discrimination complaint, especially after the Civil Rights Commission ruled in her favor. Her claims arise under Ohio Revised Code §4112. The Ohio Supreme Court has held that federal case law interpreting Title

---

[17] In the interest of keeping her response to a reasonable length, Plaintiff is dealing with all of her allegations of retaliation in one section and is not conceding or abandoning any claim.

VII is "generally applicable to cases involving alleged violations of R.C. Chapter 4112."*Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civil Rights Commission,* 66 Ohio St. 2d 192, 196, 20 Ohio Op. 3d 200, 421 N.E.2d 128 (1981).

In *Hawkins v. Anheuser-Busch, Inc.* 517 F.3d 321, 345 (6th Cir. Ohio 2008) the court reaffirmed a plaintiff's burden of proof when pursuing a retaliatory harassment claim:

> In order to establish a prima facie case of retaliation under this court's Title VII case law, an employee must establish that (1) he or she engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action. *See Morris v. Oldham County Fiscal Ct.,* 201 F.3d 784, 792 (6th Cir. 2000). The Supreme Court in *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006), however, made clear that the scope of Title VII's retaliation provision is broader than that of Title VII's discrimination provision. *Id.* at 2412-14; *see also* Civil Rights Act of 1964, §§ 703(a), 704(a), 42 U.S.C. §§ 2000e-2(a), 2000e-3(a). In contrast to Title VII's discrimination provision, the "adverse employment action" requirement in the retaliation context is not limited to an employer's actions that solely affect the terms, conditions or status of employment, or only those acts that occur at the workplace. *See Burlington Northern,* 126 S. Ct. at 2412-14. The retaliation provision instead protects employees from conduct that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (internal quotation marks omitted).

In *Allen v. Ohio Dep't of Job and Family Services,* 697 F. Supp. 2d 854 (S.D. Ohio 2010) this court applied the standard articulated in *Morris v. Oldham County* and evaluated retaliatory harassment claims similar to those in the present case. In *Allen,* the plaintiff alleged that he was subjected to severe and pervasive harassment in retaliation for his claims of race discrimination against the agency. The plaintiff pointed to a pattern of harassment that included his supervisor refusing to communicate with him except through email and giving him the "cold shoulder;" being assigned lower-level duties, co-workers being asked to take sides or to not speak with him, his supervisor nit-picking every detail of his work, micro-managing him, misapplying the attendance policy against him, giving him bad performance evaluations and subjecting him to a performance improvement plan. In denying the defendant's Motion for Summary Judgment the court emphasized that these incidents must not be viewed in isolation, but rather must be considered

together in order to determine whether the plaintiff was subjected to severe or pervasive harassment. *Id* at 903-905.

As in the *Allen* case, after Plaintiff Delphine Henry filed her civil rights charge, she was subjected to increased scrutiny of her performance, every detail of her work was nit-picked, and the relationship with her supervisor and co-workers changed. Before she filed her charge, in February 2010, Plaintiff received a 98.8% on her monthly call quality scores. In March she received 98.7%, in April a 98.3%, and in May, a 98.3%.[18] After Defendant learned of Plaintiff's charge on June 10, 2010 everything changed.

Marvin began documenting all of her conversations with Plaintiff. The Employee Relations department contacted Marvin frequently and wanted to stay in touch with what was going on with Plaintiff. (Marvin Dep. p. 253-254). Employee relations provided Marvin with a special form to document her conversations with Plaintiff. Marvin sent the forms to Employee Relations after each meeting with Plaintiff. (Marvin Dep. pp. 290-91).

Prior to filing her charge, Plaintiff underwent live call monitoring by a senior representative about once per month. The process is called a "sit-with." After she filed her charge, the frequency of Plaintiff's sit-withs was increased. (Henry Dep. p. 115). Plaintiff testified that these sessions were used to intimidate her. (Henry Dep. p. 118).

After Plaintiff complained to Employee Relations, Marvin disseminated pre-assessment surveys to the senior representatives. On June 25, 2010 Marvin documented a meeting she had with Plaintiff to discuss the outcome of those surveys. She informed Plaintiff of the many negative comments she received on the anonymous pre-assessment surveys. After the meeting, Marvin's Sr. Coordinator was assigned to monitor Plaintiff's calls in order to compile her monthly call quality scores. (Marvin Dep. Ex. 46; Henry Dep. p. 123). Not surprisingly, for June, Plaintiff received an 88.4% on her call quality scores. After this meeting with Marvin and call monitoring with her Sr. Coordinator, Plaintiff emailed Employee Relations to

---

[18] No scores were compiled for January 2010.

complain that she was being harassed because of her civil rights charge. (Henry Dep. Ex. 12). Marvin characterizes Plaintiff's demeanor during this time as angry, stiff, reserved and aloof. She admits her relationship with Plaintiff was strained. (Marvin Dep. pp. 297-99).

On October 29, 2010, while working on the Similac recall Plaintiff gave a customer her user name and password so that he could check the status of his refund. By doing this, she committed a violation of Defendant's Code of Business Conduct and Electronic Media policy. She was suspended for two weeks after which a written warning was issued. (Marvin Dep. Ex. 46). This was the first time Plaintiff had ever been disciplined while working for Defendant. (Marvin Dep. pp. 316-317). After Plaintiff returned from suspension in November, she was placed on the training line which is normally reserved for newly hired reps. (Marvin Dep. pp. 316-318).

For a period of time, from November 22, 2010 until December 9, 2010 Plaintiff's activities were tracked on an hour by hour basis. (Marvin Dep. pp. 319-320). When asked if she was instructed to keep close track of Plaintiff. Marvin admitted that, management wanted her to. (Marvin Dep. p. 322).

On December 2, 2010 Marvin contacted Boskovic to inform her that she wanted to move towards a performance improvement plan for Plaintiff. Marvin testified that she made this request in conjunction with Boogard and her local HR. She admits that she had NEVER been involved in administering a performance improvement plan before. She understood it could be a step in the progressive discipline process. (Marvin Dep. p. 324). Boskovic coached Marvin about how to document Plaintiff's performance "towards a performance improvement plan." Boskovic and Marvin discussed giving Plaintiff a Not Achieving (NA) on her 2010 performance evaluation. Marvin felt pressured by upper level management to move towards a PIP and an NA on the performance evaluation. (Marvin Dep. pp. 326-328).

On February 18, 2011 Plaintiff received her 2010 performance review. Her ranking in nearly every sub-category was a PA or NA. She received an overall PA (Partially Achieves). (Marvin Dep. p. 331, Ex. 55). Marvin admits that she gave Plaintiff PAs and NAs in areas where she had never been marked down

before.  (Marvin Dep. p. 336).  For example, she received a PA in her call quality scores even though her annual call quality average warranted a rank of AE.  (Marvin Dep. p. 333).  Boogard had input when writing the evaluation.  (Marvin Dep. p. 337).

Throughout the first half of 2011 Plaintiff was not allowed to return to her normal job duties and remained on the training line.  On April 28, 2011 the Ohio Civil Rights Commission issued a decision in Plaintiff's race case.  The Commission determined that it was probable that Defendant had engaged in unlawful discrimination.  (Marvin Ex. 26).  On April 29, 2011 Boskovic spoke with the local HR representative Kevin Mason about the outcome of Plaintiff's charge and Mason alleged that Plaintiff was demonstrating on-going performance issues.  Mason informed Boskovic that management "wants to take the next step but feeling paralyzed to do anything formal." (Boskovic Dep. p 196, Ex. 15, pp. 1250-1251).

By May 12, 2011 Boskcovic was working with local management to create a Disciplinary Letter of Expectations with a sixty day scope.  In a call with Boogard and her boss, Peter Youngs, Boskovic was again informed that Plaintiff was allegedly not able to perform even the basic functions of her job.  Mr. Youngs stated that if Plaintiff were a new hire, they would "move towards termination." Youngs testified that he relied on Boogard and Marvin to inform him of Plaintiff's performance.  (Youngs Dep. pp. 76-88).

On June 3, 2011, Marvin issued Plaintiff the Letter of Expectations.  This was the one and only time that Marvin had ever issued such a letter.  (Marvin Dep. Ex. 11, pp. 8-9)[19].  The letter communicated to Plaintiff that she was not meeting expectations and that she would be given 60 days to improve her performance and return to her normal duties on the nutrition line.  Her progress was to be measured by receiving Achieving Expectations (AEs) on her monthly call quality scores.  After detailing her unacceptable call quality scores for the first five months of 2011, the letter threatens "further action" if her performance did not improve. (Marvin Dep. Ex. 58).  Youngs admits that this was a step in the disciplinary process.

---

[19] Defendant admitted that no other performance memos were issued between 2009-2011.  Defendant was asked whether any other Letters of Expectations were issued by Marvin and if so, to produce them.  None were revealed or produced.

(Youngs Dep. 76-88).  Plaintiff understood the letter as a threat to her job and realized that no matter how hard she worked, her career at Abbott was over.  (Henry Dep. pp. 155-158).

Plaintiff's realization is substantiated by the following facts.  The chart below illustrates Plaintiff's call quality scores for the first five months of 2011.  The second column is how the scores were reported on the Letter of Expectations.  The Third column are Plaintiff's actual scores as they were reported to Boogard at the end of each month:

| | Exhibit 58 Letter of Expectation | Exhibit 64 Report from Marvin to Boogard |
|---|---|---|
| January 2011 | 94.4% = AE | 94.4% = AE |
| February  2011 | 92 % = PA | 94.2% = AE |
| March 2011 | 88.7 % = NA | 93.1% = PA |
| April 2011 | 92.2% = PA | 94.5% = AE |
| May 2011 | 91.6% = PA | 91.6% = PA |
| YTD Avg. | 91.7% = PA | 93.56% = PA |

Boogard verified that, each month, her managers were required to report the quality statistics for their team.  These statistics included individual scores for each team member.  Scores were turned in at the end of each month.  (Boogard Dep. Ex. 64).  The Letter of Expectations was created in May, 2011.

Defendant will argue that Plaintiff was subjected to increased scrutiny because Plaintiff was having difficulty with the new software system: Salesforce.com and/or because she committed a violation of the Electronic Media policy.  Plaintiff does not deny that she violated this policy and has accepted full responsibility for her actions.  However, each member of Plaintiff's management team agreed that the punishment she received for this violation (a suspension AND a written warning) was sufficient to address the violation.  There was no justification for ongoing punishment related to this error.  Plaintiff does not allege that this written warning is part of the harassment she suffered.  But, it is clear that Defendant is using that violation as an excuse for every retaliatory act that followed it.  For example, Defendant will argue that Plaintiff deserved to remain on the training line for eight months after she committed this violation, but this argument is belied by the Manager's actions in fabricating low call quality scores in order to justify issuance

of the Letter of Expectations. Why, if Plaintiff was performing so poorly, was it necessary for her Manager to misrepresent her quality scores? Defendant controlled the documentation in this case. And pursuant to specific instructions given to her by Employee Relations, Plaintiff's Manager created a paper trail to cover her true motives. There is no question that the acts of retaliation that Plaintiff endured would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Hawkins* at 345.

## V.     PLAINTIFF WAS FORCED FROM HER CAREER.

After receiving the Letter of Expectations, Plaintiff's stress level and anxiety were so high that her doctor recommended a medical leave of absence. (Henry Dep. p. 171). When she returned to work, she learned that she would remain on the training line and understood that the requirements detailed in the Letter of Expectations were still in full force and effect. She knew that no matter how hard she tried, her performance would never be good enough. Defendant would use the Letter of Expectations to fire her. (Henry Dep. pp. 173-175). She decided to resign her position before being fired and turned in a letter detailing how she believed she was being forced into retirement. (Henry Ex. 28).

In *Harris v. Board of Educ*, 789 F. Supp. 1331; 1992 U.S. Dist. LEXIS 9499, this Court denied reviewed a similar case where the plaintiff alleged race discrimination and constructive discharge. In *Harris*, as here, the plaintiff was a long term employee of defendant. Like Plaintiff, *Harris* sought a promotion that was denied in favor of a Caucasian employee. Like Plaintiff, *Harris* filed a Civil Right charge alleging discrimination. And, like Plaintiff, *Harris* alleged that his employer engaged in a campaign of harassment against him. The harassment included a reduction in Harris' teaching duties, denial of certain benefits, verbal abuse, and invocation of a "special evaluation" procedure in which he was rated unsatisfactory in four areas when he had previously received a satisfactory regular evaluation just six months earlier. As in this case, the defendant argued that the special evaluation was justified by the fact that the plaintiff was not up to the standards that he previously possessed. Eventually, Harris felt compelled to retire and submitted his resignation in a letter he titled: "Letter of Forced Resignation" *Id.* at 1333-1336.

As part of his prima facie case, Harris alleged that he was constructively discharged. When denying the defendant's Motion for Summary Judgment, the court examined the elements of a constructive discharge allegation: "In order to establish that he was constructively discharged Harris must show that the employer's conduct had the reasonably foreseeable effect of causing a reasonable person in Harris's shoes to quit. *Id* at 1346. [citing *Lynch v. Freeman*, 817 F.2d. 380 (6th Cir. 1987)].

Recently, in *Laster v. City of Kalamazoo, 746 F.3d 714, 728* (6th Cir. Mich. 2014) the Court of Appeals articulated the test for constructive discharge as follows: Plaintiff must adduce evidence to show that 1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit. *Saroli v. Automation and Modular Components, Inc.*, 405 F.3d 446 (6th Cir. 2005); *Logan v. Denny's*, 259 F.3d at 568 (6th Cir. 2001).

In the present case, Plaintiff read the handwriting on the wall. She was being set up for termination and she knew it. Plaintiff had suffered a reduction in her job responsibilities by being placed on the training line and not being allowed to return to her normal duties. Every aspect of her work was scrutinized and criticized. Any hope she ever had for promotion was gone. And finally, she was being subjected to discipline that she didn't deserve based upon fabricated call quality scores. As Laurie Boogard's boss, Pete Youngs, stated in a conversation with Boskovic, they were "moving towards termination." The Letter of Expectations was just the first step. (Boskovic Ex. 15).

Plaintiff's decision to resign was both subjectively and objectively reasonable. She had tried filing an internal complaint, but that didn't work to improve things. Filing a charge with the Civil Rights Commission only made things worse. It was either quit or be fired. Plaintiff chose to leave with her dignity and her retirement benefits, intact and the Defendant got what it wanted.

## VI. Plaintiff Had No Motive to Conceal Her Race Claims from the Bankruptcy Court Therefore, to the Extent that She Failed to Disclose These Claims, Such Failure was Inadvertent.

Plaintiff filed bankruptcy in November 28, 2008. She received her discharge in April 2009. She retained counsel to assist her with her Civil Rights charge in or around May 2010. The charge was filed May

4, 2010. Before that time, Plaintiff had no intention of filing a race claim against Defendant and did not believe such a claim would have any monetary value. Even when Plaintiff filed her initial claim, she was not seeking a lump sum payment, but rather, her hope was that the OCRC would intervene and Defendant would correct its discriminatory practices and grant her the opportunity to train for a promotion. (Plaintiff's Affidavit is attached hereto as Exhibit I).

In the Motion for Summary Judgment Defendant, while talking out of both sides of its mouth, argues that Plaintiff's discrimination claims should be dismissed pursuant to the doctrine of judicial estoppel. Defendant argues that dismissal is appropriate because Plaintiff had knowledge of the underlying facts supporting her discrimination claims prior to filing bankruptcy and did not disclose them to the bankruptcy court. The basis for Defendant's argument are a couple of sentences drawn from Plaintiff's deposition testimony that "sometime after 2002" she formed a belief that she was being treated differently than her Caucasian peers in terms of eligibility for promotion. (Henry Dep. pp. 66-69). It is true, Plaintiff suspected that she was being treated differently because of her race, but she didn't believe she had evidence to prove it. In fact, it wasn't until the Ohio Civil Rights Commission actually investigated her claims that she was informed of how comparable employee scored on their pre-assessment surveys. (Henry Dep. pp. 67-68, 83, 87). Later in its Motion, Defendant strenuously argues that Plaintiff still has no evidence that comparable employees were treated more favorably and has no evidence of pretext, yet for purposes of bankruptcy she was expected to recognize her claims and reveal them.

In *Browning v. Levy*, 283 F.3d 761, 775-776 (6th Cir. Ohio 2002) the Court articulated the policy reasons underlying the doctrine of judicial estoppel:

> This court has stressed that the doctrine of judicial estoppel is utilized in order to preserve "the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship." … (T)he evil to be avoided is colorfully described as "the perversion of the judicial machinery," "playing fast and loose with the courts," "blowing hot and cold as the occasion demands," and" having [one's] cake and eating it too." (internal citations omitted).

There are three factors which courts in this Circuit should look for when deciding whether to apply judicial estoppel and dismiss a lawsuit: (1) whether the plaintiff "assumed a position that was contrary to the one that she asserted under oath in the bankruptcy proceedings, (2) the bankruptcy court adopted the contrary position either as a preliminary matter or as part of a final disposition, and (3) the plaintiff's omission did not result from mistake or inadvertence. *White v. Wyndham Vacation Ownership*, 617 F.3d 472, 478. There are two circumstances under which a debtor's failure to disclose a cause of action in a bankruptcy proceeding may be deemed inadvertent. One is where the debtor lacks knowledge of the factual basis of the undisclosed claims and the other is where the debtor has no motive for concealment. *Browning* at 776, citing *In re Coastal Plains, Inc.* 179 F.3d 197, (5th Cir. 1999).

Pursuant to USCS §541(a) the bankruptcy estate includes all legal or equitable interests of the debtor **as of the commencement of the case**. Causes of action for monetary damages are property of the bankruptcy estate. *United States ex. rel. Gerbert v. Transport Admin. Servs. 260 F. 3d 909, 913 (8th Cir. 2001)*. In Chapter 7 bankruptcy proceedings assets of the bankruptcy estate include only those causes of action that have accrued prior to filing of the bankruptcy petition. *Harms v. Cigna Ins. Cos.,* 421 F. Supp. 2d 1225 (D.S.D. 2006). A claim accrues before filing of a bankruptcy petition if all of the elements of the cause of action had occurred as of the time that the bankruptcy case was commenced. *Id.* at 1229.

In *Amtrak v. Morgan*, 536 U.S., 101, 113 (U.S. 2002) the Supreme Court closely examined the question of when a disparate treatment claim accrues under Title VII. The Court provided the following analysis:

> First, discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

There are two reasons why the court should decline to apply the doctrine of judicial estoppel to erase all of Plaintiff's race claims in this case: 1) Plaintiff's failure to list the claim was inadvertent because she had no motive to conceal the claim from the bankruptcy court; and 2) even if judicial estoppel applies to prevent her from bringing her pre-petition claims, it should not prevent her from pursuing the claims that accrued thereafter because those claims are not part of the bankruptcy estate.

Pursuant to the Court's decision in *Morgan*, each time after 2002 that Defendant declined to identify Plaintiff as a candidate for promotion, was a new and distinct claim of discrimination.  The facts are as follows:

When Plaintiff and her husband filed bankruptcy under Chapter 7 of the Bankruptcy Code in November 2008 she did not list any race discrimination claims against Defendant because, at the time, she had no intention of pursuing those claims and had no idea that they had any value to her or the bankruptcy court.  (Affidavit Ex. I)  Plaintiff finally filed her race discrimination charge with the Ohio Civil Rights Commission on May 4, 2010 - while she was still employed by Defendant.  Plaintiff's motive for filing the civil rights charge at that time was to correct Defendant's discriminatory practices in the hope that she would finally be afforded the same promotional opportunities as her peers.  She wanted the Commission to intervene on her behalf since her internal complaints had failed.  At that time, she was not seeking a financial award.  (Affidavit Ex. I).  Even now, Plaintiff has refrained from seeking monetary damages for discrimination that occurred before 2009.  Attached hereto as Exhibit J is the report prepared by Plaintiff's financial expert.  This report was served on Defendant pursuant to the Court's scheduling order.  Plaintiff's expert calculated damages arising from Defendant's failure to promote Plaintiff beginning in 2009.

In *Browning v. Levy* the court reversed the District Court's application of judicial estoppel to dismiss a plaintiff's claims because the plaintiff in that case did not stand to receive a windfall payment as a result of its failure to disclose its claims in bankruptcy.  The Court determined that, "The lack of motive for concealment leads to the conclusion that (plaintiff's) failure to disclose was, without any evidence to the

35

contrary, inadvertent. (Defendant) provides no evidence that (plaintiff) intended to 'have its cake and eat it too.' Thus, (plaintiff's) inadvertence renders the application of judicial estoppel inappropriate to prevent it from now asserting its claims against (defendant)." *Id.* at 776.

As in the *Browning* case, Plaintiff will not receive any monetary windfall as a result of her alleged concealment. Although she will certainly point to past acts as evidence of discrimination, she has confined her claim for monetary damages to discriminatory acts that occurred beginning in 2009. Damages arising out of those discrete acts of discrimination are outside the scope of the bankruptcy estate.

Furthermore, even if the court finds that Plaintiff had a motive for concealment, judicial estoppel should not bar her from pursuing claims that accrued after the commencement of her bankruptcy. Defendant's Management has testified that CR2 training took place twice per year. Thus, each year, Plaintiff had two chances to be identified as a candidate and each time she was passed over because of her race was a new and discrete act, of discrimination. Each act, if not time-barred, is actionable on its own.

In *Morgan,* the court further noted, "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." *Morgan,* p. 114.

## VIII.  CONCLUSION.

Plaintiff Delphine Henry should be allowed to have her day in Court. As presented above and in documents and testimony too voluminous to include in this Response, the evidence in this case supports a conclusion that Defendant discriminated against Plaintiff because of her race. Unlike her Caucasian peers, she was denied the opportunity to train for promotion. No matter how hard she worked or how well she performed it wasn't good enough. After exercising her right to file charges, she was subjected to retaliatory discipline and harassment and was constructively discharged from her job.

Wherefore, Plaintiff respectfully requests that the Court deny Defendant's motion and schedule this matter for trial so that a jury may resolve all of the issues of fact.

Respectfully submitted,

*/s/ Sharon Cason-Adams*
Sharon Cason-Adams (0067550)
Sharon@alhattorneys.com
Adams & Liming, LLC
1988 West Fifth Avenue, Suite 14
Columbus, Ohio  43212
(614) 488-2053 Telephone
(614) 488-2069 Facsimile

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Response in Opposition to Defendant's Motion was served upon:  Jon E. Klinghoffer, Goldberg Kohn LTD 55 East Monroe, Suite 3300, Chicago,  Illinois 60603 via electronic transmittal at jon.klinghoffer@goldbergkohn.com this 20th day of April 2015.

*/s/ Sharon Cason-Adams*
Sharon Cason-Adams (0067550)