**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**DELPHINE HENRY,**

          **Plaintiff,**

**v.**                                     **Case No.: 2:12-cv-841**
                                                **JUDGE SMITH**
                                                **Magistrate Judge Kemp**

**ABBOTT LABORATORIES,**

          **Defendant.**

## OPINION AND ORDER

In this action, plaintiff, Delphine Henry, alleges that defendant, Abbott Laboratories, failed to promote and constructively discharged her because of her race in violation of Title VII, as amended, 42 U.S.C. § 2000e-5, and in violation of Ohio Revised Code § 4112. Plaintiff also asserts a state law claim for retaliation. Plaintiff moves for sanctions for spoliation of evidence and to strike affidavits submitted by defendant in opposition to plaintiff's motion for sanctions. (Doc. 45, 51). Defendant moves for summary judgment. (Doc. 54). For the reasons that follow, the Court grants defendant's motion for summary judgment and denies plaintiff's motions.

## I.    BACKGROUND

**A.**    *Procedural Background*

On May 4, 2010, plaintiff filed a charge with the Ohio Civil Rights Commission ("OCRC") alleging that defendant impermissibly denied her a promotion in violation of state and federal law. In June of 2010, defendant learned about plaintiff's charge and put a litigation hold on employment documents related to her allegations. (Affidavit of Rebecca Fincher ("Fincher Affidavit"), at ¶4). Defendant responded to plaintiff's charge on July 1, 2010. The OCRC

initially found no probable cause, but upon reconsideration, found probable cause on April 28, 2011.  Plaintiff apparently filed a second charge alleging retaliation on September 9, 2011.

On September 13, 2012, plaintiff filed her initial Complaint.  After failing to appear at a December 6, 2012 pretrial conference and failing to comply with several Court orders, plaintiff's case was dismissed for failure to prosecute on January 16, 2013 pursuant to Rule 41(b) of the Federal Rules of Civil Procedure.  Plaintiff had until February 15, 2013 to appeal that dismissal.  Fed.R.App.P. 4(a)(1)(A).  No appeal was filed.  On April 11, 2013, defendant lifted the litigation hold and documents collected by its legal department were destroyed.  (Fincher Affidavit, ¶6; Affidavit of Julie Matovich ("Matovich Affidavit"), at ¶4).

On October 29, 2013, plaintiff moved for relief from the dismissal of her case pursuant to Rule 61(b) of the Federal Rules of Civil Procedure.  On January 3, 2013, the Magistrate Judge recommended that the Court grant Plaintiff that relief.  The next day, defendant reinstituted a litigation hold on documents related to plaintiff's allegations.  (Fincher  Affidavit, ¶7).  This Court ultimately adopted the Magistrate's recommendation and granted plaintiff relief from the dismissal of her case.  Plaintiff was also permitted to file an Amended Complaint on April 24, 2014.  In it, she alleged race discrimination in violation of Title VII and Ohio law and alleged retaliation in violation of Ohio law.

**B.**    *Factual Background*

### 1.  Defendant's Consumer Relations Department

Plaintiff is an African American woman who was employed by defendant in its Consumer Relations Department from 2009 until September 29, 2011.[1]  The Consumer Relations

---

[1] Plaintiff was employed in the department prior to 2009 but indicates that although she points to "past acts as evidence of discrimination" her claims for monetary damages are confined to acts beginning in 2009.  (Doc. 61, *PAGEID#* 1950.)  Accordingly, the Court has examined all of the record but focuses its discussion on acts occurring from 2009 forward.

Department was a call center that fielded complaints from consumers and healthcare professionals about defendant's products.  Complaints were classified into three categories. Level One complaints involved relatively uncomplicated issues such as complaints about product taste or dents in product packaging.  Level Two complaints involved more complex issues such as complaints about product defects.  Level Three complaints involved more serious "adverse events" such as products making people ill.

Consumer Relations Representative I ("Rep I") was the entry level position in the Consumer Relations Department.  Rep I's handled Level One complaints, logged all calls they received in a database, and drafted letter responses to consumer inquiries.  Rep I's were also expected to determine if a complaint qualified as a Level Two or Level Three complaint and to forward them to supervisors in the department.  Rep I's could be promoted to a Consumer Relations Representative II ("Rep II").  Rep IIs were permitted to handle higher level complaints, including at times, Level Two and Level Three complaints.  Quality Coordinators and Senior Representatives in the department fielded complaints and held additional responsibilities. Managers oversaw teams comprised of Rep I's, Rep II's, Quality Coordinators, and Senior Representatives.

The performance of Rep I's and Rep II's was monitored in several ways.  Managers would randomly listen to three to five randomly selected calls handled by each Rep I or Rep II on his or her team every month.  Performance during those calls would be scored and used to generate a monthly performance rating for how each Rep I and Rep II handled calls.  Managers also assessed how well Rep I's and Rep II's logged complaints in the database and drafted letter responses to consumer inquiries.  Those assessments were used to create monthly performance ratings for these activities as well.  The monthly performance ratings were compiled annually

and made part of each employee's annual performance review.  The monthly and annual

performance ratings consisted of four ratings categories: Exceeding Expectations (EE);

Achieving Expectations (AE); Partially Achieving Expectations (PA); and Not Achieving

Expectations (NA).

 A Rep I could be promoted to Rep II if he or she possessed, amongst several things, one

year of experience as a "fully functioning" Rep I.  This generally meant that a Rep I had to have

annual performance rating of at least AE to be considered a candidate for promotion.  To be

promoted, a manager would identify a list of Rep I's that he or she managed who were

candidates for promotion to Rep II at the beginning of August and February of each year.  After

that list was of candidates was identified, "Rep II readiness surveys" would be distributed to

Senior Representatives and Quality Coordinators on the same team as a Rep I who was identified

as a candidate for promotion to Rep II.  The surveys, also referred to as pre-assessment surveys,

asked Senior Representatives and Quality Coordinators to anonymously assess a Rep I's ability

to perform Rep II responsibilities.  The survey results were then compiled by Senior

Coordinators and provided to the Rep I's manager.  A Rep I needed to attain a score of 80% -

85% in order to be eligible to move to the next promotional phase— training for the Rep II

position.

### 2. 2008 and 2009

 In 2008, plaintiff was a Rep I on a team managed by Carol Marvin.  On March 5, 2009,

plaintiff received her performance evaluation for 2008.  Plaintiff received an overall rating of AE

for 2008.  Nevertheless, plaintiff received a PA in one evaluation subcategory: "Operations,

Written Correspondence – Inquiry Letters."  (*PAGEID#* 2215).  Marvin did not identify plaintiff

as a candidate for promotion to Rep II in August of 2009.  Accordingly, Marvin did not

distribute Rep II readiness surveys for plaintiff, plaintiff was not anonymously assessed by Senior Representatives and Quality Coordinators on her team, and plaintiff was not eligible for Rep II training.

In 2009, plaintiff remained a Rep I on a team managed by Marvin.  On February 2, 2010, plaintiff received her performance evaluation for 2009.  Plaintiff received another overall rating of AE for 2009.  But plaintiff received a PA in one evaluation subcategory: "Competencies: Innovation."  (*PAGEID#* 2206).  Marvin met with plaintiff on February 4 and 22, 2010 to discuss plaintiff's performance evaluation for 2009.  Marvin did not identify plaintiff as a candidate for promotion to Rep II at that time.

### 3.    2010

In March of 2010, plaintiff sent an email to Marvin and Marvin's supervisor, Laurie Boogard, indicating that she had been in the department for a long time and wished to be considered for a promotion to Rep II in the near future.  Boogard responded that length of tenure in the department was not an indicator of which role was most suitable and indicated that Marvin would speak with plaintiff about plaintiff's development.  After receiving plaintiff's email, Marvin distributed Rep II readiness surveys to Quality Coordinators and Senior Representatives on plaintiff's team.  The survey results were not favorable— plaintiff did not receive a score of 80% or better.  Plaintiff filed her charge with the OCRC in May of 2010 alleging that defendant impermissibly failed to promote her on the basis of her race.

Plaintiff remained a Rep I on a team managed by Marvin in 2010.  At her deposition, plaintiff agreed that her "performance in 2010 was worse than it had been in previous years." (Deposition of Delphine Henry, 119:16-19, *PAGEID#* 573).  Specifically, the Consumer Relations department implemented a new software system called Salesforce.com.  Plaintiff and

others had difficulties learning that new system.  Plaintiff also had at least two recorded instances where she provided incorrect information to consumers who called the department seeking information about product recalls.  Plaintiff also had at least one recorded instance where a consumer became frustrated and hung up after she was unable to answer the consumer's question.

Moreover, in November of 2010, plaintiff provided a consumer who called the department to inquire about a refund with a password that allowed the consumer to access an internal database maintained by defendant for defendant's employees.  The database contained confidential information including the names and addresses of other consumers entitled to a refund.  After management learned that plaintiff had given the consumer access the internal database, defendant was forced to shut down all access to the database for several days.  During that period, defendant created new usernames and passwords for its employees.  Plaintiff was also temporarily suspended while defendant investigated the security breach.  At the end of that investigation, plaintiff received a written warning.  Plaintiff was also placed on a call training line when she returned from suspension and required to receive a rating of AE for call quality for three consecutive months before she could resume her normal duties.

On February 18, 2011, plaintiff received her performance evaluation for 2010.  Plaintiff received an overall rating of PA for 2010.  Marvin did not identify plaintiff as a candidate for promotion to Rep II in February of 2011.

### 4.    2011

Plaintiff remained a Rep I on a team managed by Marvin in 2011.  Plaintiff continued to have difficulties with Salesforce.com in early 2011.  Plaintiff also received a PA rating for call quality in February, March, April, and May of 2011.  Accordingly, plaintiff was coached on May

17, 2011 and received a Letter of Expectations in June of 2011.  The letter detailed several instances where plaintiff had not used Salesforce.com properly.  It also indicated that plaintiff had 60 days to improve her performance.

Shortly after receiving the June 11, 2011 letter, plaintiff began a medical leave that lasted until August of 2011.  When she returned from leave, plaintiff was returned to the training line and received a third round of training on Salesforce.com.   Plaintiff was also informed that she would still be subject to the terms of the June 11, 2011 letter.  On September 27, 2011, plaintiff tendered written resignation.  In her resignation she indicated that she was resigning in order to protect herself from retaliation from her manager.

## II.   STANDARD OF REVIEW

The standard governing summary judgment is set forth in Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate, however, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.,* 328 F.3d 870, 873 (6th Cir.2003) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

When reviewing a summary judgment motion, the Court must view all the facts, evidence and any reasonable inferences that may permissibly be drawn from the facts, in favor of the nonmoving party.  *See, e.g., Crawford v. Metro. Gov't,* 555 U.S. 271, 274 n. 1, 129 S.Ct. 846, 172 L.Ed.2d 650 (2009) (quoting *Brosseau v. Haugen,* 543 U.S. 194, 195, n. 2, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)); *Muncie Power Prods., Inc.,* 328 F.3d at 873 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The Court will ultimately determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby,* 477 U.S. at 251–52.

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989).  That is, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.  *In re Morris,* 260 F.3d 654, 665 (6th Cir.2001).

### III.  DISCUSSION

A.    *Defendant's Motion for Summary Judgment*

#### 1.  Failure to Promote in Violation of Title VII and ORC § 4112

Plaintiff asserts that defendant failed to promote her because of her race in violation of Title VII and Ohio Revised Code §4112.  Specifically, plaintiff finds fault with the fact that Marvin never identified her as a candidate for promotion from Rep I to Rep II in 2009 and 2010.

To state a *prima facie* case of race discrimination with respect to a failure to promote claim, plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she applied for and was qualified for the position; (3) she was considered for and was denied the position;

and (4) that an individual of similar qualifications who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied. *White v. Columbus Metropolitan Housing Auth.,* 429 F.3d 232, 240 (6th Cir.2005), citing *Nguyen v. City of Cleveland,* 229 F.3d 559, 562–63 (6th Cir.2000). If plaintiff meets this burden, the burden then shifts to the employer to produce a legitimate non-discriminatory reason for its promotion decision. *Id.*

### a.  Failure to Promote in 2009 for Job Year 2008

In this case, the Court concludes that plaintiff has stated a *prima facie* case with regard to defendant's failure to promote her in 2009 for job year 2008. Plaintiff demonstrates the first element because she is a member of a protected class. Plaintiff also demonstrates the second element. Although plaintiff did not formally ask to be promoted, a formal application system was not in place for promotion from Rep I to Rep II. Instead, Rep I managers identified possible candidates. *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 n. 2 (6th Cir.2000) (when "the employer does not notify its employees of the available promotion or does not provide a formal mechanism for expressing interest in the promotion," a plaintiff does not have to show that he applied for or was considered for the promotion). Moreover, plaintiff received an overall rating of AE on her March 5, 2009 performance evaluation for job year 2008, making her qualified for promotion from the Rep I to the Rep II position. Accordingly, plaintiff has sufficiently met the second element.

Plaintiff has also demonstrated the third element by showing that a similar individual who was not a member of the protected class received a promotion from Rep I to Rep II. Specifically, plaintiff points out that Amanda Nelson, who was managed by Marvin for job year

2008, was identified by Marvin as a candidate for promotion from Rep I to Rep II in 2009.  Like plaintiff, Nelson received an overall rating of AE in 2009 for job year 2008.

Despite this, there is simply no evidence that could successfully rebut as pretext Marvin's decision not to identify plaintiff as a candidate for promotion in 2009.  In considering the plaintiff's burden on this element, it is important to note that an employer may make employment decisions "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."  *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir.1984); *see also Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1083 (6th Cir.1994) (similar).  In this case, although defendant may not have had a good reason for failing to promote plaintiff, there is no evidence that could convince a reasonable jury that defendant failed to promote her because of her race.  Defendant asserts that Rep I and Rep II responsibilities differed and that even if an employee functioned well in the Rep I role, he or she may not be able to function as a Rep II.  That assertion is uncontested.

Marvin determined that despite plaintiff's AE rating as Rep I for job year 2008, she was not suited for Rep II responsibilities in 2009.  There is no evidence that race influenced that decision.  At her deposition, plaintiff testified that Marvin never used racial slurs, never called plaintiff names, and never made negative comments about African-Americans.  Indeed, the only negative comments that plaintiff described were comments that Marvin made to correct plaintiff's Appalachian accent when she pronounced certain words.  These comments, which were made by Marvin early in plaintiff's tenure, and several years before Marvin's promotion decision in 2009, made plaintiff feel "humiliated."  But they do not demonstrate racial animus, particularly given that Appalachia is a region, not a race.

10

### b.  Failure to Promote in 2010 for Job Year 2009

Plaintiff is unable to state a *prima facie* case with regard to defendant's failure to promote her in 2010 for job year 2009.  Plaintiff can demonstrate the first two elements because she was a member of a protected class and received an overall rating of AE for 2009.  Nevertheless, plaintiff has failed to demonstrate the third element— that a similar individual who was not a member of the protected class received a promotion from Rep I to Rep II.  Plaintiff points out that Rachel Wallis, a Caucasian who also received an overall rating of AE in 2010 for job year 2009, was promoted from Rep I to Rep II in 2010.  It appears, however, that Wallis was managed by a different manager, Julie Matovich.  In order to prove the second element of the *prima facie* case, the plaintiff must produce evidence that the relevant other employees are 'similarly situated in all respects.' " *Hollins v. Atlantic Co.,* 188 F.3d 652, 659 (6th Cir.) (quoting *Mitchell v. Toledo Hospital,* 964 F.2d 577, 583 (6th Cr. 1992)).  Precise equivalence between employees is not required. *See Harrison v. Metropolitan Gov't,* 80 F.3d 1107, 1115 (6th Cir.1996).  However, [T]o be deemed "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Mitchell,* 964 F.2d at 583.

Even if plaintiff could establish a *prima facie* case with regard to the promotion decision in 2010, she is still unable to demonstrate that defendant's reasons for deciding that she was not a candidate for promotion from Rep I to Rep II was pretext.  As noted, plaintiff has not alleged any

facts that suggest that race was a motive in any of Marvin's promotion decisions.[2]  Indeed, plaintiff's only attempt to demonstrate pretext about the 2010 promotion decision consists of comparing language contained in her February 2010 performance evaluation as a Rep I for job year 2009 to language contained in an email in June of 2010 where Marvin discussed plaintiff's readiness for promotion to Rep II at that time.  The language in those two documents differs, but they address different time frames and different positions.  They do not demonstrate pretext.

### 2.  Constructive Discharge in 2011 Violation of Title VII and ORC § 4112

Plaintiff also alleges that she was constructively discharged in 2011 in violation of Title VII and ORC § 4112 when she returned from medical leave in August 2011.  Plaintiff points out that when she returned from medical leave, she was kept on the training line and informed that she was still subject to the terms of the letter of expectations she had received before going on leave in June.  Plaintiff asserts that this forced her from her career, and thus she resigned in September 2011.

A constructive discharge occurs when the employer, rather than acting directly, 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." ' *Laster* v. City of Kalamazoo, 746 F.3d 714, 727-28 (6th Cir. 2014) (quoting *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d Cir.1987)).  To demonstrate a constructive discharge, plaintiff must adduce evidence to show that: 1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit.  *Id.* (citing *Saroli v. Automation and Modular Components, Inc.,* 405 F.3d 446 (6th Cir. 2005)).

---

[2] It does not appear that plaintiff alleges that defendant failed to promote her in 2011 for job year 2010.  To the extent she does, she has not asserted that she was qualified for promotion in 2011 because she received an overall rating of PA in 2011 for job year 2010.  She also admits that her performance in 2010 was worse than in prior years.

In this case, the Court finds that being put on a training line and being made subject to the letter of expectations falls short of a constructive discharge. A performance improvement plan, even one that specifically threatens termination if performance is not improved, does not constitute a constructive termination. *Agnew v. BASF Corp.*, 296 F.3d 307, 309 (6th Cir. 2002); *Farris v. Port Clinton Sch. Dist.*, 2006 WL 964719, at *14-15 (Ohio App Ct. April 14, 2006). Moreover, plaintiff does not contest that her performance in 2010, which was the impetus for the letter of expectations in 2011, was worse than it had been in previous years.

### 3. Retaliation in Violation of ORC § 4112

Plaintiff asserts that defendant retaliated against her after she filed her charge with the OCRC in May of 2010. In order to establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: (1) he engaged in activity protected by Title VII; (2) the defendant knew of this exercise of his protected rights; (3) the defendant consequently took an action that was "materially adverse" to the plaintiff; and (4) there is a causal connection between the protected activity and the materially adverse action. *Abbott v. Crown Motor Co., Inc.,* 348 F.3d 537, 542 (6th Cir.2003); *see also Burlington Northern and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (modifying the third element to require a "materially adverse action" rather than an "adverse employment action"). [3]

The Court concludes that plaintiff cannot establish the third prong— that defendant took action that was materially adverse to her. Plaintiff asserts that defendant subjected plaintiff's work to increased scrutiny and that this constituted materially adverse action. It is, however, well settled that increased scrutiny of work is not tantamount to an adverse employment action. *Allen v. Mich. Dep't of Corrections,* 165 F.3d 405, 410 (6th Cir. 1999) (holding that supervisors'

---

[3] When analyzing retaliation claims, Ohio courts rely on federal case law. *Chandler v. Empire Chem., Inc., Midwest Rubber Custom Mixing Div.*, 99 Ohio App.3d 396, 402 (Ohio App. Ct. 1994).

alleged action of monitoring the plaintiff more closely than they monitored non-African American employees did not constitute "adverse employment actions" actionable under Title VII); *Birch v. Cuyahoga County Probate Ct.,* 392 F.3d 151, 169 (6th Cir. 2004) (increased scrutiny of work did not constitute action that was materially adverse sufficient to support a retaliation claim).

Plaintiff further asserts that her poor performance review for job year 2010 and the June 2011 letter of expectations constitute materially adverse actions. In *Primes*, however, the Court rejected a plaintiff's argument that his low evaluation constituted an adverse employment action. *Primes v. Reno*, 190 F. 3d 765, 767 (6th Cir. 1999). The *Primes* Court explained:

> If every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure. Paranoia in the workplace would replace the prima facie case as the basis for a Title VII cause of action. The case law supports our view that the employer conduct in this case will not support a Title VII cause of action. *See Yates v. Avco*, 819 F.2d 630, 638 (6th Cir.1987) (plaintiff did not suffer adverse employment action, where demotion was in response to request for a transfer away from a harassing supervisor, salary and benefits were not reduced, and employee was assured that she would receive the next available position at higher grade); *Sweeney v. West*, 149 F.3d 550, 557 (7th Cir.1998) (if negative performance evaluation were deemed actionable as "retaliation," it would "send a message to employers that the slightest nudge or admonition ... can be the subject of a federal lawsuit"); *Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir.1996) (low performance evaluation and consequent ineligibility for discretionary bonus not actionable adverse employment action); *Montandon v. Farmland Industries, Inc.*, 116 F.3d 355, 359 (8th Cir.1997) (lower performance evaluation not used as basis for any action against employee not "adverse employment action"); *Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 896 (10th Cir.1994) (same).

*Id.*

Applying the foregoing to this case, the Court concludes that plaintiff's performance evaluation for job year 2010 and the 2011 letter of expectations do not constitute materially

adverse actions, particularly given that plaintiff's 2010 performance was admittedly worse than prior years.

Plaintiff contends that she suffered harassment after she filed her charge and that this constituted materially adverse action. Specifically, plaintiff contends that after she filed her charge, Marvin and others stopped talking to her; Marvin would not tell her who completed the anonymous Rep II readiness surveys that were distributed in 2010; and that plaintiff's call quality scores dropped to 96.5%. As a matter of record fact, however, plaintiff had quality scores that were lower than 96.5% before she filed her charge. Moreover, harassment must be severe or pervasive in order to sustain a retaliation claim. *Akers v. Alvey*, 338 F.3d 491, 499 (6th Cir. 2003). At most, the actions about which plaintiff complain are *de minimus*.

Plaintiff also contends that Marvin misreported her call quality scores after she filed her charge and that this constituted a materially adverse action. In support of this contention, plaintiff created a chart comparing call quality scores on two different documents. Nevertheless, defendant notes that one document reflect scores that Marvin assigned to a sample of calls handled by plaintiff and that Marvin evaluated. (Affidavit of Carol Marvin, at ¶6). The other document reflects scores assigned to calls handled by plaintiff that were compiled from scores assigned by Marvin and others during the same period who evaluated samples of calls handled by plaintiff. (*Id*. at ¶8). Accordingly, this does not constitute a materially adverse action sufficient to support plaintiff's retaliation claim. For these reasons, the Court dismisses plaintiff's retaliation claim.

**B.**     ***Plaintiff's Motion for Sanctions and Motion to Strike***

Plaintiff has also moved for sanctions for spoliation because personnel documents were destroyed. Specifically, during discovery, plaintiff requested production of personnel

documents, including performance evaluations and Rep II readiness surveys for 27 employees that purportedly worked in the same department as plaintiff.  (Doc. 45-2).  Defendant responded that it would "produce responsive documents to the extent that they exist . . . ." (*Id.*)  Both parties concede that defendant produced a large quantity of documents.  (Doc. 45-1, *PAGEID#* 187; Doc. 50, *PAGEID#* 423).  Plaintiff nevertheless filed her spoliation motion on February 12, 2015, and sought an adverse inference or summary judgment.  Several days later, defendant produced performance evaluations for one of the 27 employees and Rep II readiness surveys for six of the 27 employees.  (Affidavit of Sharon Cason-Adams ("Cason-Adams Affidavit"), at ¶¶ 2-3, 11).  At that time, defendant's counsel told plaintiff's counsel that the Rep II readiness surveys were not being produced from defendant's files but were documents that had been produced to and bates stamped by the OCRC and kept in files maintained by defendant's outside counsel.  (*Id.*, ¶ 8).

When opposing plaintiff's spoliation motion, defendant submitted affidavits from several employees, including Rebecca Fincher, a senior litigation paralegal, and Cindy Foster, a Director in Business Human Resources.  The Fincher Affidavit generally described that although defendant instituted a litigation hold on documents when it learned of plaintiff's charge, that hold was lifted and documents were destroyed after this Court dismissed plaintiff's case for failure to prosecute.  (Fincher Affidavit, ¶¶ 3-7).  The Foster Affidavit indicated that 19 of the 27 employees identified by plaintiff never held the Rep I position or were promoted from Rep I to Rep II before May of 2009.  (Affidavit of Cindy Foster ("Foster Affidavit"), at ¶ 4).  Plaintiff moved to strike these two affidavits.

The term "spoliation" includes the destruction of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.  *Owner–*

*Operator Indep. Drivers Ass'n v. Comerica Bank,* 860 F.Supp.2d 519, 537–38 (S.D. Ohio 2012). The Sixth Circuit Court of Appeals has explained that, "the authority to impose sanctions for spoliated evidence arises not from substantive law but, rather, 'from a court's inherent power to control the judicial process.' " *Adkins v. Wolever,* 554 F.3d 650, 652 (6th Cir. 2009) (en banc); *see also Zubulake v. UBS Warburg LLC,* 229 F.R.D. 422, 430 (S.D.N.Y.2004) ("The authority to sanction litigants for spoliation arises jointly under the Federal Rules of Civil Procedure and the court's inherent powers."). Accordingly, the Court applies federal law when determining whether spoliation has occurred. *Id.*

To establish entitlement to an adverse inference, plaintiff must show that: (1) defendant had an obligation to preserve evidence at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to Plaintiff's claims such that a reasonable trier of fact could find that it would support that claim. *See Beaven v. United States DOJ,* 622 F.3d 540, 553 (6th Cir.2010). Nevertheless, courts generally will not impose an adverse inference unless the party destroyed the evidence in bad faith. *See In re Nat'l Century Fin. Enters., Inc. Financial Investment Litigation,* No. 2:03–md–1565, 2009 WL 2169174, at *3 (S.D. Ohio July 16, 2009).

In this case, Plaintiff argues that Defendant's duty to preserve performance reviews and survey results arises from regulation. Specifically, a regulation promulgated by the Department of Labor provides that an employer is obligated to preserve all personnel records for a year, including records related to promotions and selection for training. 29 CFR § 1602.14. That regulation also provides that once a charge of discrimination has been filed, an employer is obligated to preserve "all personnel records relevant to the charge or action until final disposition of the charge or the action." 29 CFR § 1602.14. The regulation specifically defines "final

disposition of the charge or the action" as the date when the statutory period to file an action in a U.S. District Court expires or, when an action is brought against an employer, the date when that litigation is terminated. *Id.*

Several courts, including the Seventh Circuit, have held that the failure to preserve records in violation of a regulation requiring retention can give rise to an inference of spoliation, even if litigation involving the records is not reasonably foreseeable at the time the records are made. *Johnson v. Metropolitan Govt' of Nashville,* Nos. 3:07-0979, 2010 WL 3342211, at *18 (M.D. Tenn. Aug. 24, 2010) (citing *Byrnie v. Town of Crowmwell Bd. of Educ.,* 243 F.3d 93, 109–10 (2nd Cir.2001); *see also Latimore v. Citibank Fed. Savs. Bank,* 151 F.3d 712, 716 (7th Cir.1998); *Favors v. Fisher,* 13 F.3d 1235, 1239 (8th Cir.1994); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1419 (10th Cir.1987)). In each such case, however, there was a regulatory violation. The Court finds that no such violation occurred here.

Plaintiff filed her charge with the OCRC in May of 2010. The regulation obligated Defendant to preserve all personnel documents related to Plaintiff's charge. 29 CFR § 1602.14. Accordingly, Defendant put a litigation hold on documents when it received notice of the charge in June of 2010. (Fincher Affidavit, at ¶4). On January 16, 2013, Plaintiff's case was dismissed for failure to prosecute pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. Plaintiff never appealed that dismissal and the litigation was terminated. 29 CFR § 1602.14. Thereafter, defendant lifted the litigation hold and documents collected by the legal department were destroyed. (Fincher Affidavit, ¶6; Matovich Affidavit, ¶4). Not until six months later did plaintiff seek relief from the dismissal of her case pursuant to Rule 61(b) of the Federal Rules of Civil Procedure. And defendant reinstituted a litigation hold the day after the Magistrate recommended that the Court grant plaintiff the requested relief. (Fincher Affidavit, ¶7). On

18

these facts, in this case, the Court finds that defendant did not commit a regulatory violation. Defendant put a hold on documents when it learned of the charge and kept it in place until this case was disposed of by this Court's dismissal with prejudice.  Defendant began preserving documents again when the case was reinstated.

The Court also concludes that even if did defendant had an ongoing obligation to preserve the documents, on these facts, there is no evidence that defendant possessed a level of culpability that would justify imposition of sanctions, including an adverse inference or summary judgment.  Absent any indication to the contrary, it appears that defendant reasonably believed plaintiff's case had been disposed of when this Court's dismissed plaintiff's case with prejudice. Indeed, this Court believed that plaintiff's case had been finally adjudicated.

The Court is also not convinced that the documents at issue are sufficiently relevant to plaintiff's claims to justify sanctions.  With regard to plaintiff's allegations that defendant failed to promote her because of her race in 2009 and 2010, plaintiff sought performance evaluations and Rep II readiness surveys for 27 employees that purportedly worked in the department where she worked.  Defendant asserts that 19 of those 27 employees never held Rep I position or were promoted from Rep I to Rep II before May of 2009.  (Foster Affidavit, at ¶ 4).  Accordingly, although performance evaluations for those 19 employees may be somewhat probative, they are not directly relevant to the time frame at issue.  As for the Rep II readiness surveys, defendant asserts that Rep II readiness surveys for all six employees promoted from Rep I to Rep II between May of 2009 and May of 2010 have been produced.  (Doc. 50, *PAGEID#* 424). Plaintiff does not deny this.  Moreover, plaintiff does not explain how performance evaluations or Rep II readiness surveys for other employees are relevant to her constructive discharge or retaliation claim which, unlike plaintiff's failure to promote claim, do not necessarily involve a

comparison of how plaintiff was treated to how other similarly situated employees were treated but instead entails an analysis of how plaintiff was treated after defendant learned of her protected activity.  Accordingly, the Court declines to impose a sanction for spoliation. Plaintiff's motion for sanctions for spoliation is denied.

The Court also declines to strike the Fincher and Foster affidavits.  Plaintiff asserts that they should be struck because neither Fincher nor Foster were identified in defendant's Rule 26(a)(1) disclosures or in defendant's responses to plaintiff's interrogatories, and because the affidavits were not produced by defendant in response to document requests.  Nevertheless, Rule 26(a)(1) only requires identification of witnesses with information that may support a party's claims or defenses, and the interrogatory at issue seeks identification of lay and expert witnesses who might be called at trial.  Both affiants, however, only aver to information relevant to the spoliation issue and not to information pertinent to defendant's defenses to plaintiff's claims. Fincher avers to the history of the litigation hold while Foster avers to limited information that sheds light on the relevance of the missing documents.  In addition, it appears that the affidavits were created on March 11, 2015 so that defendant could specifically respond to plaintiff's motion for spoliation on March 12, 2015.  Accordingly, they were not responsive to document requests propounded prior to that date.  Although the Court is somewhat dismayed that defendant failed to inform plaintiff about the history of the litigation hold and the destruction of documents at an earlier point during discovery, the Court does not find that defendant's delay is so egregious as to warrant sanctions, particularly given that both parties agree that defendant produced a large quantity of documents.  (Doc. 45-1, *PAGEID#* 187; Doc. 50, *PAGEID#* 423). For these reasons, plaintiff's motion to strike the Fincher and Foster affidavits is also denied.

## IV.  CONCLUSION

Based on the foregoing reasons, Defendant's Motion for Summary Judgment is

**GRANTED**.  In light of this disposition, the Court declines to rule on whether and which of

plaintiff's claims might be time barred by plaintiff's bankruptcy action.  Plaintiff's Motion for

Sanctions for Spoliation and Plaintiff's Motion to Strike are **DENIED**.

The Clerk shall remove Documents 45, 51, and 54 from the Court's pending motions list.

The Clerk shall terminate this case.

**IT IS SO ORDERED.**

_____*s/ George C. Smith*_____
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**